UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALLISON NAVAR and CAMILLE ROBERTSON, on
behalf of themselves and others similarly situated,

Plaintiffs,

-against-

WALSH CONSTRUCTION COMPANY II, LLC,
SKANSKA USA CIVIL NORTHEAST, INC., and
SKANSKA USA BUILDING, INC.,

Defendants.

Case No. 18-CV-10476 (LGS)

---

**MEMORANDUM OF LAW IN SUPPORT OF THE CONSOLIDATED MOTION TO
SEVER BY DEFENDANTS WALSH CONSTRUCTION COMPANY II, LLC AND
SKANSKA USA CIVIL NORTHEAST INC. AND SKANSKA USA BUILDING INC.**

**KELLEY DRYE & WARREN LLP**
101 Park Avenue
New York, New York 10178
Phone: (212) 808-7800
Facsimile: (212) 808-7897

*Attorneys for Defendant Walsh Construction
Company II, LLC*

**LITTLER MENDELSON, P.C.**
1300 IDS Center
80 South 8th Street
Minneapolis, Minnesota 55402
Phone: (612) 630-1000
Facsimile: (612) 630-9626

One Newark Center
1085 Raymond Blvd., 8th Floor
Newark, New Jersey 07102
Phone: (973) 848-4700
Facsimile: (973) 643-5626

*Attorneys for Defendants Skanska USA Civil
Northeast Inc. and Skanska USA Building
Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................................................1

STATEMENT OF FACTS ......................................................................................................2

I.   DEFENDANTS ARE INDEPENDENT BUSINESSES THAT OPERATE SEPARATELY FROM EACH OTHER. ........................................................................2

    A.   Walsh Operates Independently from the Skanska Defendants. ...............................3

    B.   The Skanska Defendants Operate Independently from Walsh and Each Other. .......................................................................................................................3

        1.   Skanska Civil, an Independent Business, Did Not Employ Any Plaintiff. ...................................................................................................4

        2.   Skanska Building Operates as an Independent Business. ...........................4

    C.   Walsh and the Skanska Defendants Entered Into a LaGuardia Project Joint Venture. .................................................................................................................5

II.  EACH PLAINTIFF WORKED FOR ONLY ONE NAMED DEFENDANT. ..................6

    A.   Allison Navar Worked For One Company: Walsh. .................................................6

        1.   Walsh Alone Hired, Trained and Onboarded Navar. ..................................7

        2.   Walsh Alone Determined Navar's Compensation, Paid Navar, and Addressed Navar's Pay-Related Complaints. ..............................................8

        3.   Walsh Was Responsible for Supervising Navar. ........................................9

        4.   Navar Complained to Walsh Personnel Regarding Her Pay and Ultimately Resigned from Walsh in May 2018. .......................................10

    B.   Camille Robertson Worked for One Company: Skanska Building. .......................11

        1.   Skanska Building Hired Robertson in July 2016. .....................................11

        2.   Skanska Building Determined and Paid Robertson's Compensation. .........................................................................................12

        3.   The Skanska Defendants Alone Supervised Robertson. ...........................13

        4.   Robertson Resigned from Skanska Building in March 2018. ...................14

ARGUMENT .......................................................................................................................14

I.   LEGAL STANDARD .....................................................................................................14

II.  APPLICABLE LAW .......................................................................................................16

III. THE SKANSKA DEFENDANTS ARE NOT A JOINT EMPLOYER OF NAVAR. .........................................................................................................................18

    A.   The Skanska Defendants Had No Power to Hire or Fire Navar. ...........................19

    B.   The Skanska Defendants Could Not Supervise Navar or Control the Conditions of Her Employment with Walsh. .......................................................19

| | C. | The Skanska Defendants Did Not Determine Navar's Compensation. ................20 |
|---|---|---|
| | D. | The Skanska Defendants Did Not Maintain Employment Records for Navar. ....................................................................................................................21 |
| IV. | | WALSH IS NOT A JOINT EMPLOYER OF ROBERTSON. ........................................21 |
| | A. | Walsh Could Not (and Did Not) Hire or Fire Robertson. .....................................21 |
| | B. | Walsh Could Not (and Did Not) Supervise Robertson, Control Her Work Schedule or Control the Conditions of Her Employment. ....................................23 |
| | C. | Walsh Was Not Involved with Robertson's Compensation. .................................23 |
| | D. | Walsh Did Not Maintain Employment Records of Robertson. .............................24 |
| CONCLUSION | | ....................................................................................................................................25 |

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Barfield v. N.Y. City Health & Hosps. Corp.*,
    537 F.3d 132 (2d Cir. 2008)......................................................................16

*Cannon v. Douglas Elliman, LLC*,
    No. 06 Civ. 7092, 2007 WL 4358456 (S.D.N.Y. Dec. 10, 2007)...................................3, 17-19

*Carter v. Dutchess Community College*,
    735 F.2d 8 (2d Cir. 1984)……………………………………………….......................*passim*

*Clinton's Ditch Co-op Co. v. N.L.R.B.*,
    778 F.2d 132 (2d Cir. 1985).......................................................................20

*Goldberg v. Whitaker House Coop., Inc.*,
    366 U.S. 28 (1961)........................................................................16

*Guaraca v. Cafetasia Inc.*,
    No. 17-CV-1516 (VSB), 2018 WL 4538894 (S.D.N.Y. September 20, 2018) ................16, 17

*Herman v. RSR Sec. Servs.*,
    172 F.3d 132 (2d Cir. 1999)......................................................................16

*Martin v. Spring United Mgmt. Co.*,
    273 F.Supp.3d 404 (S.D.N.Y. Sep. 27, 2017).......................................................21

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
    214 F.R.D. 152 (S.D.N.Y. 2003) ..................................................................15, 25

*Morris v. Northrop Grumman Corp.*,
    37 F. Supp. 2d 556 (E.D.N.Y. 1999) ..............................................................15

*Murphy v. Heartshare Human Serv. of New York*,
    254 F.Supp.3d 392 (E.D.N.Y. 2017) .........................................................16, 17, 24

**Other Authorities**

Fed. R. Civ. P. 21 ..............................................................................14

# **INTRODUCTION**

Plaintiffs in this action worked for two companies that, everyone agreed on the record, function separately in the real world. The one thing Plaintiffs do appear to have in common is that they walked into the office of the same attorney, who has elaborated a theory that these functionally separate companies—which, plaintiffs both acknowledged in their depositions, have separate Human Resources functions, hired them separately, came to the LaGuardia Airport reconstruction project separately, will continue to employ their own employees when that project is done, and otherwise have completely independent existences in reality—are really just one company because they have an agreement to jointly contribute resources to the LaGuardia project.

Plaintiffs thus appear to mistake Defendants' limited joint venture agreement—apparently, the single source of Plaintiffs' "joint employer" theory, taking their Complaint at face value—for something like an employment policy, or some kind of article of incorporation creating a single entity, rather than for what it is: an agreement between separate entities, with separate sets of employees and employment practices, to contribute their individual resources to a construction project they will complete together. Under established law, this is insufficient to establish a joint employer relationship.

Here, far from evidencing that Defendants are merely nominally distinct entities that in reality behave like one employer, the record of the discovery ordered by the Court demonstrates the exact opposite: two separately-employed individuals are alleging that their separate employers, next-door neighbors on the LaGuardia project, did not pay them fairly. Accordingly, the claims alleged by Plaintiffs against the separate Defendants must be severed and litigated as the factually and legally separate claims that they are.

### STATEMENT OF FACTS

## I. DEFENDANTS ARE INDEPENDENT BUSINESSES THAT OPERATE SEPARATELY FROM EACH OTHER.

The "joint employer" discovery ordered by the Court establishes that Walsh Construction Company II, LLC ("Walsh") (which employed Plaintiff Navar), Skanska USA Building Inc. ("Skanska Building") (which employed Plaintiff Robertson), and Skanska USA Civil Northeast Inc. ("Skanska Civil") (which employed neither of them) are operationally distinct and not the joint employer of Plaintiffs:

- Each operates an independent business with no overlapping employees or leadership. (*See* Sections I.A, I.B. and I.C, below.)

- Walsh did not hire, fire, establish rates of pay, discipline, promote, demote, or perform any other "employer" function with respect to Robertson, nor did it have the authority to make those decisions with respect to any Skanska employee. (*See* Section IV, below.)

- The Skanska Defendants did not hire, fire, establish rates of pay, discipline, promote, demote, or perform any other "employer" function with respect to Navar, nor did they have the authority to make any of those decisions with respect to any Walsh employee. (*See* Section III, below.)

- Walsh and the Skanska Defendants did not keep or maintain employment records for anyone other than their own employees. (*See* Section III.D and IV.D, below.)

- Each entity only supervised its own employees. (*See* Sections III.B and IV.B, below.)

- Walsh, based in Chicago, maintains its own ownership, leadership and independent policies and procedures exclusive to its own organization. (*See* Section I.A, below.)

- The Skanska Defendants, subsidiaries of Skanska USA, Inc., have entirely separate ownership, leadership, policies, and employees from Walsh. (*See* Section I.B, below.)

- Skanska Building and Skanska Civil have separate leadership and employees from each other. (*See* Section I.B, below.)

Against that background, it is clear from the Complaint that Plaintiffs' "joint employer" allegations depend *entirely* on the existence of the joint venture agreement for the LaGuardia

Project.[1] The appeal of this argument to Plaintiffs is clear: it gives them multiple companies in which to root around for members of a class the Complaint cannot clearly identify. But that attempt is unsupported by the record and as a matter of law (*see* Section II, pages 17-19, below (citing *Cannon v. Douglas Elliman, LLC*, No. 06 Civ. 7092, 2007 WL 4358456, at \*4, n.3 (S.D.N.Y. Dec. 10, 2007) ("pleading a joint venture does not trigger joint employer status because it is possible for joint venturers to separately employ different people for different aspects of a project")).

### A.  Walsh Operates Independently from the Skanska Defendants.

Walsh is a Chicago-based, fourth-generation family-owned company that provides design, finance, operation and outfitting services and employs thousands of workers in many different capacities.  (Declaration of Jeffry Twidwell at ¶ 3, hereinafter "Twidwell Decl.".)  No Walsh employees are also employed by the Skanska Defendants.  (Twidwell Decl., ¶ 4.)  Walsh is the sole entity responsible for hiring and firing its own employees and determining their compensation, including at the LaGuardia Project.  (*Id.*, ¶ 5.)  Walsh maintains its own employment records for employees as well as its own employment policies, many of which are branded with Walsh logos.  (*Id.*, ¶ 6.)  Walsh also makes its own decisions with regard to disciplining, assigning, and supervising employees.  (*Id.*, ¶ 7.)  Walsh services many clients in various locations beyond the LaGuardia Project.  (*Id.*, ¶ 8.)

### B.  The Skanska Defendants Operate Independently from Walsh and Each Other.

The Skanska Defendants—Skanska Civil and Skanska Building—are two separate business units of Skanska USA, Inc. (Declaration of John Novak at ¶ 7, hereinafter "Novak Decl.".) Skanska Civil and Skanska Building have distinct leadership teams and maintain

---

[1]    *See* Complaint at ¶¶ 14, 15, 16, 17, 18, 19, 20, 21, 22.

separate profit and loss statements. (Novak Decl. ¶¶ 13-14; Declaration of Scott Silverman at ¶¶ 8, 10 hereinafter "Silverman Decl.".) The Skanska Defendants share some centralized support functions with the other Skanska USA, Inc. business units, including human resources services, but not with any Walsh entities. (Konkel Decl., Ex. A,[2] Novak Dep. 56:19-57:8.)

### 1. Skanska Civil, an Independent Business, Did Not Employ Any Plaintiff.

Skanska Civil specializes in public works construction and the replacement and reconstruction of infrastructure. (Silverman Decl. ¶ 7.) The President and CEO of Skanska Civil is Don Fusco. (Silverman Decl. ¶ 8.) Skanska Civil has its own Board of Directors, none of whom serve on the boards of Walsh or Skanska Building. (Silverman Decl. ¶ 8.) Skanska Civil has its own General Counsel and maintains its own accounting. (Silverman Decl. ¶¶ 8, 10.)

Skanska Civil employs approximately 7,000 workers and makes its own decisions with regard to hiring, firing, disciplining, assigning, and supervising them. (Silverman Decl. ¶ 11.) Skanska Civil has many clients outside of the LaGuardia Project. (Silverman Decl. ¶ 12.) Aside from the LaGuardia Project Joint Venture, Skanska Civil is not working on any projects with Walsh. (Silverman Decl. ¶ 6.) Neither Plaintiff has ever been employed by Skanska Civil. (Silverman Decl. ¶ 13.)

### 2. Skanska Building Operates as an Independent Business.

Skanska Building focuses on construction of office and mixed-use buildings, hospitals, and many other kinds of buildings for private and public works customers. (Novak Decl. ¶ 11.) The President and CEO of Skanska Building is Paul Hewins. (Novak Decl. ¶ 13.) Skanska Building has its own Board of Directors and General Counsel, none of whom also work for

---

[2] All references to "Ex. _" are to the exhibits annexed to the Declaration of Mark A. Konkel, Esq. in Support of Defendants' Motion to Sever ("Konkel Decl."). True and correct copies of excerpts of the deposition transcripts of John Novak ("Novak Dep."), Jeff Twidwell ("Twidwell Dep."), Plaintiff Allison Navar ("Navar Dep."), and Plaintiff Camille Robertson ("Rob. Dep."), and certain deposition exhibits, are annexed to the Konkel Declaration.

Skanska Civil or Walsh. (Novak Decl. ¶ 13.) It maintains its own accounting systems. (Novak Decl. ¶ 14.) Skanska Building employs more than 3,000 construction professionals nationwide, and makes its own decisions with regard to hiring, firing, disciplining, assigning, and supervising its employees. (Novak Decl. ¶ 15.) It too has many of its own clients. (Novak Decl. ¶ 17.)

### C. Walsh and the Skanska Defendants Entered Into a LaGuardia Project Joint Venture.

In March 2015, Walsh, Skanska Building, and Skanska Civil entered into a Joint Venture Agreement to renovate LaGuardia Airport (the "JVA"). (Ex. B.) Both Plaintiffs admitted that Walsh and the Skanska Defendants are separate business entities from one another. (Ex. C, Navar Dep. 161:10-15; Ex. D, Rob. Dep. 29:20-30:5.) Relatedly, Navar failed to identify a single individual who was in actuality an employee of Skanska Civil.[3] (Ex. C, Navar Dep. 165:25-167:12.) Indeed, Navar admitted that businesses can operate a joint venture together and maintain their independence, as was the case with the LaGuardia Project (Ex. C, Navar Dep. 161:10-19), and acknowledged that once the LaGuardia Project is completed, Defendants will, of course, each continue to operate separately. (Ex. C, Navar Dep. 40:18-41:21.)

Under the JVA, Walsh and the Skanska Defendants agreed to contribute their own personnel to assist with the project. (Ex. B, §6.2.) None of these personnel, with the exception of craft workers, are employees of the Joint Venture itself. (Ex. E, Twidwell Dep. 14:19-15:4.) All employees working on the LaGuardia Project, other than craft workers, are employees of Walsh, Skanska Building, or Skanska Civil, but not one person is employed by all three.[4]

---

[3]   Navar incorrectly speculated that a Skanska Building employee, Diana Rios, was a Skanska Civil employee. (Ex. C, Navar Dep. 165:25-167:12; Silverman Decl. ¶ 13.) Navar could not name any other Skanska Civil employees. (*Id.*)

[4]   Plaintiffs, who were not craft workers, do not purport to represent craft workers as part of the putative class, and the Joint Venture's practices with respect to those employees are not at issue in this lawsuit. (*See* Compl. ¶¶ 25, 29, 41 (putative class members include only "female employees who predominantly performed non-manual labor...at the Skanska/Walsh Joint Venture...").) The Joint Venture has a Code of Conduct, (Ex. B, JVA Ex. F),

The JVA provides that each Defendant will "supply and make available" their own employees to the Joint Venture. (Ex. B, §6.2.) The JVA expressly recognized that these project staff remain employees of their own company, not of the Joint Venture or of each other. The JVA explains that, "[a]ny employee furnished by a party shall remain in the employment of the particular party and shall not be an employee of the joint venture, but shall cooperate with and serve under the authority of the project officer." (Ex. B, §6.2.) Further, Walsh and the Skanska Defendants share no common policy regarding employee compensation. (Ex. C, Navar Dep. 155:15-156:2.) Employees of one Defendant are not given preferential treatment or seniority if they leave one Defendant and seek to join another. (Novak Decl. ¶ 10.)

The Joint Venture maintains organizational charts to orchestrate "who does what," or the "functional relationship[s] *within the project*." (Ex. E, Twidwell Dep. 29:17-30:3, 34:11-14.) (emphasis added). The purpose of the organization charts is to show "which functional groups team members work in." (Ex. A, Novak Dep. 51:7-12.) An overall project leader oversees the work of the whole project, but he directs functional group leaders, who manage their own teams. (Ex. A, Novak Dep. 97:19-98:10.)

## II. EACH PLAINTIFF WORKED FOR ONLY ONE NAMED DEFENDANT.

### A. Allison Navar Worked For One Company: Walsh.

The facts are straightforward: Walsh hired Navar, paid her, trained her, supervised her, and controlled the terms and conditions of her employment. The Skanska Defendants did none of this. (*See* Ex. C, Navar Dep. 17:25-18:24, 36:23-37:5, 130:24-131:3; Declaration of Michael

---

which is interpreted to apply to craft employees, not Plaintiffs or the putative class members they seek to represent. (Ex. A, Novak Dep. 43:9-20.) The Walsh and Skanska Defendants each have their own codes of conduct that apply to their respective employees. (*Id.*) Walsh employees that contribute to the joint venture project are subject only to the Walsh and Joint Venture codes of conduct. (Ex. E, Twidwell Dep. 16:21-17:11.).

Castellon at ¶¶ 6-11, hereinafter "Castellon Decl."; Ex. E, Twidwell Dep. 5:13-14, 59:1-2, 73:14-18.) As such, the Skanska Defendants were not Navar's joint employer.

### 1. Walsh Alone Hired, Trained and Onboarded Navar.

In or around October 2016, Navar uploaded her resume on LinkedIn. (Ex. C, Navar Dep. 10:4-22.) Walsh received a copy of Navar's resume, and after reviewing it, Walsh employees decided to interview Navar to determine whether to hire her. (Twidwell Decl. ¶ 9.) Walsh first conducted a telephone interview with Navar, and then conducted a second interview via Skype. (Ex. C, Navar Dep. 17:25-18:24.) Two Walsh employees, Jeff Twidwell and Kevin Pfeiffer, participated in both interviews, and another Walsh employee, Nadine Karaa, participated in the second interview. (*Id.*) Only Walsh employees were involved in Navar's interview process, and Navar did not interview with anyone from the Skanska Defendants for any position. (Ex. C, Navar Dep. 36:23-37:5, 130:24-131:3.)

In December 2016, Walsh offered Navar a job as a Claims Project Engineer in its Aviation Building Group. (Ex. F; Ex. C, Navar Dep. 27:17-28:22.) Navar reported directly to Walsh employee Twidwell. (Ex. F.) Navar's offer letter was sent to her on Walsh-branded letterhead, and Navar admitted her understanding that it was Walsh, not some joint entity, that had extended the offer of employment. (Ex. F; Ex. C, Navar Dep. 29:12-14.) Walsh provided employment benefits to Navar, including her 401(k) plan, corporate computer and cell phone, and all standard corporate Walsh benefits. (Ex. F.) After accepting her offer, Navar informed Twidwell of her start date and Twidwell, in response, advised Navar that Jessica Ehresman (another Walsh employee) would send her onboarding information. (Ex. G.)

During the onboarding process, Navar received and completed many *Walsh* (not Skanska) employment-related documents, including W-4 and I-9 forms and the Walsh Employee Handbook. (Ex. C, Navar Dep. 43:18-21, 132:17-23; Ex. H.) These documents were not

submitted to the Skanska Defendants, and the Skanska Defendants did not maintain copies of such documents. (Novak Decl. ¶ 19.) Further, Navar never received an employee handbook or other employment policies from the Skanska Defendants, and her Walsh employee handbook made no reference to the Skanska Defendants being her employer. (Ex. C, Navar Dep. 43:22-44:2, 146:21-147:8.) Walsh provided Navar with training at the beginning of her employment, which was, according to Navar, conducted through the "Walsh portal." (Ex. C, Navar Dep. 50:6-22.) Navar received medical and dental benefits from Walsh. (Ex. C, Navar Dep. 60:14-61:5.)

### 2. Walsh Alone Determined Navar's Compensation, Paid Navar, and Addressed Navar's Pay-Related Complaints.

Navar admitted that Walsh, not Skanska, paid her. (Ex. C, Navar Dep. 54:4-25.) The Skanska Defendants did not determine Navar's base compensation, her bonus, or her benefits. (Castellon Decl. ¶ 8; Ex. E, Twidwell Dep. 23:1-24:1.) Navar did not (and could not) contend that the Skanska Defendants had any input into her compensation level and admitted that Walsh was the entity that issued her paychecks. (Ex. C, Navar Dep. 54:16-25, 56:10-20.)

In August 2017, Navar complained to her supervisor, Twidwell, that her compensation was too low. (Ex. C, Navar Dep. 149:11-17; Ex. I.) Tellingly, she brought this complaint, as any employee would, to *her employer, Walsh*, not to anyone at Skanska. (Ex. C, Navar Dep. 151:8-12; Ex. I.) Ultimately, Walsh increased Navar's pay after an internal discussion involving *only* employees of Walsh. (Ex. E, Twidwell Dep. 74:17-23.) Twidwell did not seek approval from the Skanska Defendants to increase Navar's compensation, and simply informed the Skanska Defendants of Navar's pay increase. (Ex. E, Twidwell Dep. 74:24-75:17.)[5] Similarly, a few months later, Sean Walsh notified Navar by letter on Walsh letterhead, that she would receive a

---

[5] Navar admitted that she did not know who approved the change in her pay. (Ex. C, Navar Dep. 57:19-59:4.)

bonus from Walsh. (Ex. J.) Navar received a bonus from Walsh, acknowledging that Sean Walsh was not an employee of Skanska. (Ex. C, Navar Dep. 59:10-60:11.)

### 3. Walsh Was Responsible for Supervising Navar.

Walsh exercised exclusive supervisory authority over Navar. The Skanska Defendants had no control over her work schedule, primary job duties or day to day issues, including the need for personal time off. (Castellon Decl. ¶ 11.) When Navar began working for Walsh, her main job duties included maintaining a project correspondence log, assisting in preparing correspondence, and setting up and maintaining a database of project contractual documents. (Ex. C, Navar Dep. 80:19-85:25.) Navar's duties were performed at the request of her supervisor, Twidwell. (Ex. C, Navar Dep. 86:2-9.) Twidwell also prepared an updated job description for Navar when Walsh increased her compensation. (Ex. C, Navar Dep. 86:18-87:24.)

Navar further admitted that Walsh approved her time off from work; when she wanted time off, Navar testified she asked Twidwell because he was her manager. (Ex. C, Navar Dep. 74:13-23.) If Navar believed there was an error in calculating her PTO, she similarly contacted Twidwell because Twidwell "adjusted the salary on PTO time." (Ex. C, Navar Dep. 75:15-76:13.) Twidwell remained Navar's sole supervisor throughout her tenure at Walsh. (Castellon Decl. ¶ 9.) After approximately one year with Walsh, Navar begin to work with, *but not for*, Michael Castellon, an employee of Skanska Building and legal counsel for the LaGuardia Project. (Castellon Decl. ¶¶ 2-5; Ex. E, Twidwell Dep. 32:18-33:2.) During her employment, Navar assisted with joint venture legal work, working closely with Twidwell in this capacity, who is not currently a practicing lawyer. (Ex. C, Navar Dep. 139:20-24; Ex. E, Twidwell Dep. 3:23-24, 39:3-11.) In an effort to maintain the attorney-client privilege and to consolidate the Joint Venture's legal resources, Navar was assigned to work with Castellon, (Ex. E, Twidwell Dep. 38:11-39:2.), though she continued to report to Twidwell. (Twidwell Decl. ¶ 10.)

While Castellon worked with Navar on legal issues related to project-related disputes, he did not (and had no authority to) direct Navar's day-to-day activities or set her schedule. (Castellon Decl. ¶ 11.) For example, on one occasion, Castellon asked Navar to attend a meeting with him; however, Navar declined because it conflicted with her personal plans. (Castellon Decl. ¶ 9.) Castellon could not (and did not) discipline Navar for missing this meeting, or compel her to attend the meeting. (Castellon Decl. ¶ 10.) The power to discipline Navar remained with Walsh at all times. (Castellon Decl. ¶ 10.)

Castellon did not evaluate Navar's performance. (Castellon Decl. ¶ 12.) Navar admitted that only Twidwell completed her performance review form, with the exception of sections drafted by Navar herself. (Ex. C, Navar Dep. 105:20-25; 137:16-20.) By Navar's own admission, Castellon had no input into Navar's written performance review. (Ex. C, Navar Dep. 137:16-20.)[6]

### 4. Navar Complained to Walsh Personnel Regarding Her Pay and Ultimately Resigned from Walsh in May 2018.

Throughout her tenure at Walsh, Navar repeatedly complained about her pay *to Walsh personnel only*. (Ex. I; Ex. C, Navar Dep. 151:8-12.) Despite many complaints, Navar never complained about her pay to anyone at Skanska. (Ex. I; Ex. C, Navar Dep. 151:8-12.) Some of the complaints related to Navar's incorrect belief that another *Walsh* employee earned more than Navar. (Ex. I.) Navar ultimately resigned from Walsh on May 5, 2018. (Ex. C, Navar Dep. 118:17-120:9.) Walsh completed and maintained the paperwork regarding the end of Navar's employment, as it did all of Navar's employment records. (Twidwell Decl. ¶ 11.)

---

[6]   Plaintiffs will likely make much of the fact that, when Twidwell and Navar met to discuss the review, Twidwell invited Castellon to that meeting to provide additional feedback, if any, to Navar. (Ex. E, Twidwell Dep. 73:1-13.) This is a red herring, as Defendants do not dispute that, of course, there were interactions between management for Walsh and Skanska on the job. That is far from actual supervisory authority over employees: Twidwell invited Castellon to sit in the meeting because Castellon could provide better comments to Navar on joint venture legal matters that she worked on. (Ex. E, Twidwell Dep. 73:8-13.) While Castellon attended this meeting, he was clear that Twidwell remained Navar's supervisor. (Castellon Decl. ¶¶ 13-14.)

**B.  Camille Robertson Worked for One Company: Skanska Building.**

**1.  Skanska Building Hired Robertson in July 2016.**

Skanska Building hired Robertson without seeking approval to do so from any Walsh employee. (Silverman Decl. ¶ 14.) Around May or June 2016, Robertson first applied for a job with Skanska by submitting her resume online via websites Monster or Indeed, after which she was directed to Skanska's website to complete an employment application. (Ex. D, Rob. Dep. 15:20-16:25, 18:18-21.) During the hiring process, Robertson completed a Skanska Building job application with the clear logo "SKANSKA" stamped on the form. (Ex. K.) Robertson did not submit a job application to Walsh, and she acknowledged there were no references to "Walsh" in the application. (Ex. D, Rob. Dep. 82:25-83:19.) After receiving her employment application, Skanska Building interviewed Robertson and hired her as a Document Control Manager to work on the LaGuardia Airport Project. (Ex. D, Rob. Dep. 18:24-19:15; Ex. L.) No Walsh employees participated in any interviews with Robertson, and none were involved in Skanska Building's decision to hire Robertson. (Ex. D, Rob. Dep. 18:24-20:11.) In fact, Robertson received her offer letter from Naeisha Williams, Human Resources Manager for Skanska, on Skanska letterhead. (Ex. L.) The letter explained her supervisor would be Skanska Building's Richard Pomaville and stated that Robertson's benefits and pay would come from Skanska Building. (*Id.*) Walsh was not mentioned in the offer letter. (*Id.*) The offer letter directed Robertson to accept the employment offer with Skanska Human Resources by signing the letter (*Id.*), which Robertson did without raising the fact that the word "Walsh" was absent from the letter. (Ex. D, Rob. Dep. 83:20-85:12.)

Skanska Building provided Robertson with employment policies, which did not mention Walsh or the Joint Venture, and Robertson affirmed that she was required to comply with the policies of Skanska Building. (Ex. D, Rob. Dep. 84:15-85:4, 88:3-90:17; Ex. L-M.) When

Robertson began working, Robertson submitted her employment paperwork to Skanska Building, the only entity that maintained her employment records. (Ex. D, Rob. Dep. 63:2-14, 90:18-93:10.) She did not complete any training courses with Walsh, nor did she believe that Walsh's employment policies applied to her. (Ex. D, Rob. Dep. 88: 3-90:17, 99: 2-14.)

### 2. Skanska Building Determined and Paid Robertson's Compensation.

Skanska Building offered Robertson a starting salary of $82,000, plus incentives. (Ex. L.) Skanska Building is the only entity that issued Robertson her paychecks and provided her benefits. (Ex. D, Rob. Dep. 14:3-6, 93:16-94:15.) Walsh did not offer or provide any benefits to Robertson during the course of her employment. (Ex. D, Rob. Dep. 101:7-14.) Similarly, Robertson submitted a form which authorized Skanska Building to access and deposit her paycheck into her bank account. (Ex. D, Rob. Dep. 93:2-6.) Robertson never provided Walsh with such access. (Ex. D, Rob. 93:7-10.)

Around November 2016, Robertson completed an application for a promotion. (Ex. D, Rob. Dep. 41:5-42:6.)  In connection with this, Robertson asked for a raise and specified an exact number in the application form and Skanska countered with a lower number. (Ex. D, Rob. Dep. 41:24-42:6, 42:18-24.) Robertson then tendered a resignation to Silverman, as she was disappointed with the salary offered by Skanska. (Ex. D, Rob. Dep. 40:4-41:5, 42:25-43:12.) Thereafter, in a meeting with Skanska employees only, Skanska offered Robertson an increase in her salary, which she accepted. (Ex. D, Rob. Dep. 44:9-22, 45:7-10.) Walsh had no involvement in this negotiation. (Twidwell Decl. ¶ 12.)

In the summer of 2017, Robertson's supervisor, Richard Pomaville, left Skanska Building. (Ex. D, Rob. Dep. 45:19-46:5.) In July 2017, Skanska Building gave Robertson a project-based title of "Document Control Director" for the LaGuardia Project. (Ex. N) With this added responsibility, Skanska Building increased Robertson's salary to $100,000 per year, plus

incentives. (*Id.*) John Novak, Scott Silverman, Brian Tighe, and Naeisha Williams—all employees of the Skanska Defendants—were involved in the decision to give Robertson a raise. (Ex. A, Novak Dep. 61:14-62:20.) Walsh had no involvement in the decision to change Robertson's pay in or about the summer 2017. (Twidwell Decl. ¶ 13.) To the extent a Walsh employee was even advised of the raise, it was required by the JVA. (Ex. A, Novak Dep. 62:25-63:6; Ex. B, JVA Ex. E, n.7.)

### 3.  The Skanska Defendants Alone Supervised Robertson.

Robertson testified that the department she worked in, Document Control, was not a part of Walsh and admitted she never reported directly to any employees of Walsh. (Ex. D, Rob. Dep. 34:13-14, 101:25-102:3.) When she began working for Skanska Building, her supervisor was Skanska Building's Richard Pomaville, and after he left, Robertson reported to Skanska Civil's Scott Silverman until her resignation. (Ex. L; Ex. D, Rob Dep. 54:4-5.) Pomaville alone completed Robertson's first performance review, (Ex. D, Rob. Dep. 65:5-25.), and Silverman alone conducted Robertson's second performance review. (Ex. D, Rob. Dep. 67:1-68:1.) No person from Walsh contributed to her review. (Ex. D, Rob. Dep. 66:1-18.)

While Robertson speculated that Walsh's Vince Piscopo may have had the authority to discipline or terminate employees of the Skanska Defendants, when pressed, she admitted that she would have brought any disciplinary issues only to her supervisor, Skanska's Scott Silverman, not to anyone at Walsh. (Ex. D, Rob. Dep. 53:18-54:10, 55:4-8.) While Robertson also speculated that Piscopo could have hired employees of the Skanska Defendants, she again retracted her testimony to say Piscopo could have hired someone who would have worked with Robertson at the LaGuardia Project, but it was not her concern whether they were Walsh or Skanska Defendant employees. (Ex. D, Rob. Dep. 30:17-31:17, 103:2-104:18.) Robertson never discussed with Piscopo which entity would pay the employees hired to this group, never

identified a certain employee as a Walsh employee and never identified a certain employee as a Skanska employee. (Ex. D, Rob. Dep. 104:19-105-5.) Piscopo does not have the authority to hire people on behalf of either of the Skanska Defendants. (Ex. E, Twidwell Dep. 22:2-15.)

Robertson never fired a Walsh employee. (Ex. D, Rob. Dep. 102:4-7.) Robertson never completed performance evaluations for Walsh employees and no Walsh employees reported to Robertson while she was a Document Control Director for Skanska. (Ex. D, Rob. Dep. 51:9-19.)

### 4. Robertson Resigned from Skanska Building in March 2018.

In March 2018, Robertson tendered a second resignation to her supervisor, Scott Silverman. (Ex. O.) Prior to submitting her resignation in March 2018, Robertson engaged in daily conversations with Silverman regarding her position, and as such, she believed Silverman was not "blind-sided" by her resignation. (Ex. D, Rob. Dep. 72:1-20.) Tellingly, Robertson did not submit her resignation to any Walsh employee. (Ex. O.) In fact, when she resigned for this final time, Robertson stated "[m]y last date with *Skanska USA Building* is April 5, 2018" and stated her "long term goal was to *stay with Skanska* as long as they would have me." (Ex. D, Rob. Dep. 68:6-70:1, 105:15-24; Ex. O.) (emphasis added). Robertson did not mention Walsh in her resignation email. (Ex. O.)

### ARGUMENT

## I. LEGAL STANDARD

Under Rule 21 of the Federal Rules of Civil Procedure, "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party. The court may also sever any claim against a party." Fed. R. Civ. P. 21. In deciding whether to grant a motion to sever, courts in this Circuit weigh the following factors: "(1) whether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would

be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims." *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 214 F.R.D. 152, 154-55 (S.D.N.Y. 2003). The Court has "broad discretion to sever claims and parties, so long as in doing so the Court furthers the aims of justice, promotes judicial economy and efficiency, and avoids prejudicing the rights of any party." *Id.* at 155.

This Court should exercise that discretion to allow each Plaintiff to proceed only against her former employer because it is clear Plaintiffs' claims did not arise out of the same transaction or occurrence, as the only overlap in the claims is that they arose from the work Plaintiffs performed at the Joint Venture. Plaintiffs worked, however, on separate teams, with separate supervisors and co-workers, and for separate employers, which each had its own policies. Plaintiffs' claims thus do not present common questions of fact, and the law will not be applied the same to the different sets of facts. Different witnesses and documentary proof will be required for each of the separate Plaintiffs' claims, and it will not be significantly more efficient to hear Plaintiffs' claims together. Moreover, keeping Plaintiffs' claims consolidated would prejudice Defendants. Allowing a jury to hear evidence regarding both employers would make them more likely to find in favor of both Plaintiffs even if the unrelated evidence only supported one. *See, e.g.*, *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 581 (E.D.N.Y. 1999) (granting severance of plaintiffs' claims even against one employer because they involved distinct claims and because of the "potential inferences or conclusions that the jury may draw from the different claims and the strength of the respective cases"). Likewise, because Navar and Robertson are seeking recovery from different employers, which are each represented by separate counsel, settlement would be impeded by allowing their cases to proceed together.

**II. APPLICABLE LAW**

To determine whether two entities are joint employers under the FLSA, the Second Circuit evaluates the totality of the circumstances on a case-by-case basis, looking particularly at the "economic reality" of a factual situation. *See Goldberg v. Whitaker House Coop., Inc*., 366 U.S. 28, 33 (1961) (opining that "economic reality" rather than "technical concepts" is the test of employment under the FLSA); *Barfield v. N.Y. City Health & Hosps. Corp*., 537 F.3d 132, 141-42 (2d Cir. 2008). The "economic reality" test requires an analysis of a putative employer's power to control a worker – the overarching concern in determining whether an employment relationship exists. *Herman v. RSR Sec. Servs*., 172 F.3d 132, 139 (2d Cir. 1999).

In applying the "economic reality" test, courts in this Circuit utilize various factors depending on the employment situation to determine whether an employment relationship exists between a putative employer and a worker. *Guaraca v. Cafetasia Inc*., No. 17-CV-1516 (VSB), 2018 WL 4538894, at *5 (S.D.N.Y. September 20, 2018). Due to the multitude of employment situations that can arise, courts "apply common sense business analysis of the workers' simultaneous relationships to the employer entities." *Murphy v. Heartshare Human Serv. of New York*, 254 F.Supp.3d 392, 399 (E.D.N.Y. 2017).

Here, Plaintiffs attempt to plead that the relationship between Walsh and the Skanska Defendants is a "horizontal employment relationship," a situation where "two or more employers each separately employ an employee and are sufficiently associated with or related to each other with respect to the employee."[7] *Guaraca*, 2018 WL 4538894 at *5 (citing Opinion Letter, 2016

---

[7]  "Vertical joint employment" is characterized as a situation in which an employee for an intermediary employer is "economically dependent on another employer." *Guaraca*, 2018 WL 4538894 at *5 (quoting United States Department of Labor Administrator's Interpretation No. 2016-1, Opinion Letter FLSA, 2016 WL 284582). Vertical joint employment, however, is inapplicable here.

WL 284582).[8] Regardless of whether the Court considers the purported relationship between Walsh and the Skanska Defendants to be horizontal or vertical, in a joint venture scenario, the four core factors articulated by the Second Circuit in *Carter v. Dutchess Community College* are applicable. 735 F.2d 8 (2d Cir. 1984). These four factors instruct whether Walsh and the Skanska Defendants can be deemed a joint employer under the FLSA. *See Murphy*, 254 F.Supp.3d at 400 (noting "the 'economic realities' test is applied in even what could be called horizontal employment situations"); *Cannon v. Douglas Elliman*, No. 06 Civ. 7092, 2007 WL 4358456, at *4 (S.D.N.Y. Dec. 10, 2007) (explaining that the list of factors is not formulaic, and parties agreed that four joint employer factors developed as part of the "economic realities" test from *Carter* should be considered in context of a joint venture).

Plaintiffs' attempt to rely on the joint venture arrangement falls short according to this District's law. In *Cannon v. Douglas Elliman, LLC*, just as here, the plaintiffs pointed to a "joint venture" between Douglas Elliman and Cipriani/Witkoff to argue that the latter was responsible for the actions of the former. *Cannon*, 2007 WL 4358456, at *3. That argument was squarely rejected by the court. *Id.* at *4, n.3 ("pleading a joint venture does not trigger joint employer status because it is possible for joint venturers to separately employ different people for different aspects of a project"). There, as here, the plaintiffs alleged that Cipriani/Witkoff was responsible for the unpaid wages due to the alleged joint employment. *Id.* at *3. The court concluded that even though the defendants "shared a common goal," this was not sufficient to defeat the motion to dismiss. *Id* at *4. The court also noted that "[e]ven assuming that joint venture status and physical proximity were elements of the economic realities test," the court did not find them to be sufficient to establish joint employer status. *Id.* In *Cannon*, the court relied on that fact that the

---

[8]    The DOL's 2016 informal guidance on joint employment was withdrawn effective June 7, 2017.

complaint contained no facts indicating that Cipriani/Witkoff had a role in managing the employees of Douglas Elliman, and no role in hiring or firing the plaintiffs, determining their working hours, paying them, or maintaining employment records. *Cannon*, 2007 WL 4358456, at *4. Just as here, the plaintiffs did nothing more than "recit[e] the elements of a joint employer arrangement" and failed to show that Cipriani/Witkoff had a role in supervising the plaintiffs' work. *Id.* at *5. On this basis, the court concluded the complaint did not sufficiently allege joint employer status, dismissing the relevant causes of action as to the Cipriani/Witkoff defendants. *Id.*

As in *Cannon*, Plaintiffs' heavy-handed reliance on a joint venture falls short. The shared goal of Walsh and the Skanska Defendants to redevelop LaGuardia Airport does not transform three employers into one. Instead, the Court must evaluate whether the alleged employer "1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12; *Cannon*, 2007 WL 4358456 at *4. These factors go to the heart of the issue—whether Walsh employed Robertson and whether either Skanska Defendant employed Navar. The answer to each question is a resounding no.

## III. THE SKANSKA DEFENDANTS ARE NOT A JOINT EMPLOYER OF NAVAR.

The Skanska Defendants could not have been a joint employer of Navar because they had no power to control the terms and conditions of her employment and did not do so. No one from Skanska Civil had any involvement in Navar's employment and Navar could not name a single Skanska Civil employee. Moreover, no Skanska employees had the authority to hire, fire, or supervise Navar. Nor could they influence her pay, and they did not maintain her employment records. Skanska Civil is a separate entity from Walsh and Skanska Building, and Navar herself acknowledged that her only basis for asserting Skanska Civil was her joint employer was the

18

JVA. As a matter of law, though, a joint venture agreement standing along is not enough to establish joint employment. *Cannon*, 2007 WL 4358456, at *4, n.3. Skanska Civil was completely disassociated from Walsh with respect to Navar's employment, and the Court should readily find that Skanska Civil was not a joint employer of Navar. Similarly, no one from Skanska Building had sufficient control over Navar to be her joint employer. Each of the relevant factors demonstrates that neither of the Skanska Defendants had control over Navar such that they could be considered her joint employer with Walsh.

### A.  The Skanska Defendants Had No Power to Hire or Fire Navar.

The record is devoid of evidence showing that the Skanska Defendants had the ability to hire or fire Navar or for that matter any Walsh employees. *See Carter*, 735 F.2d at 12. Walsh alone was involved in Navar's hiring and Walsh employees selected Navar for an interview. (Ex. C, Navar Dep. 17:25-18:24.) Walsh conducted two interviews with Navar, and no one from the Skanska Defendants participated in either of those interviews. (Ex. C, Navar Dep. 17:25-18:24, 130:24-131:3.) Walsh alone assigned Navar to the LaGuardia Project, without any input from the Skanska Defendants (Castellon Decl. ¶ 6), and Walsh was the entity that made a job offer to Navar. (Ex. F.) Navar admitted she understood that *Walsh* was the entity had extended her an offer of employment. (Ex. C, Navar Dep. 29:12-14.)

### B.  The Skanska Defendants Could Not Supervise Navar or Control the Conditions of Her Employment with Walsh.

The second *Carter* factor also weighs against joint employment because only Walsh supervised and controlled Navar's conditions of employment. *See Carter*, 735 F.2d at 12. From the outset of Navar's employment with Walsh, Walsh employees supervised her and controlled her work. Walsh, not the Skanska Defendants, provided Navar with her employee handbook, which made no reference to the Skanska Defendants as Navar's employer. (Ex. H; Ex. C, Navar

Dep. 43:22-44:2, 146:21-147:8.) Further, Navar completed Walsh employment records, acknowledged receipts of its policies, and completed training on a Walsh portal. (Ex. C, Navar Dep. 50:6-22, 132:17-23.) Walsh defined Navar's job duties and provided her with updated job descriptions for her role when Walsh approved a pay increase. (Ex. C, Navar Dep. 86:18-87:24.) When Navar needed time off or had problems with her PTO, she sought out Walsh's Twidwell because he was her manager. (Ex. C, Navar Dep. 74:13-23, 75:15-76:13.)

Navar's limited work with Skanska Building's Castellon does not allow the allegation of joint employment to survive. Even when Navar performed limited work for and with the Joint Venture's legal team, led by Castellon, she continued to report to Twidwell. (Twidwell Decl. ¶ 10.) Castellon could not discipline Navar, formally evaluate her performance, or even require her to attend meetings. (Castellon Decl. ¶¶ 9-12; Ex. C, Navar Dep. 105:20-25; 137:16-20.) An employer cannot supervise an employee in the absence of such authority. *See, e.g.*, *Clinton's Ditch Co-op Co. v. N.L.R.B.*, 778 F.2d 132, 138-39 (2d Cir. 1985) (finding that a co-op did not supervise or discipline an employee, and therefore could not be a joint employer for purposes of the NLRA, even though the co-op requested discipline for certain employees and directly gave assignments to and made requests of the employees). In short, the Skanska Defendants did not supervise Navar, control her work schedule, or control the conditions of her employment.

### C.  The Skanska Defendants Did Not Determine Navar's Compensation.

The Skanska Defendants were not Navar's employer because they had no involvement in determining the rate or method of Navar's compensation. *See Carter*, 735 F.2d at 12. Walsh provided Navar with her initial salary and was the sole entity that provided her with benefits. (Ex. F; Ex. C, Navar Dep. 60:14-61:5.) Walsh issued Navar's paychecks, and Walsh alone provided her with a bonus. (Ex. C, Navar Dep. 54:4-10; Ex. J; Ex. E, Twidwell Dep. 23:1-24:1.) It follows that Navar only complained to Walsh about her pay, and Twidwell and other Walsh

employees provided her with a raise. (Ex. I; Ex. E, Twidwell Dep. 74:17-23; Ex. C, Navar Dep. 151:8-12.) Walsh only informed the Skanska Defendants about decisions regarding Navar's pay and did not seek their input. (Ex. E, Twidwell Dep. 74:24-75:17.) The Skanska Defendants had no involvement in determining Navar's pay and, therefore, could not be considered her joint employer. *See Martin v. Spring United Mgmt. Co.,* 273 F.Supp.3d 404, 428 (S.D.N.Y. Sep. 27, 2017) (finding evidence did not tie Sprint to the decision as to how to compensate field agents or setting the pay rate, and thus, it was not a joint employer).

### D.  The Skanska Defendants Did Not Maintain Employment Records for Navar.

The final *Carter* factor shows that the Skanska Defendants were not Navar's joint employer because they did not maintain her employment records. *See Carter*, 735 F.2d at 12. Navar submitted her initial employment paperwork, such as her Form W-4 to Walsh, and Walsh issued Navar's handbook, offer letter, and other employment materials. (Ex. C, Navar Dep. 43:22-44:2, 50:6-22, 132:17-23, 146:21-147:8.) In contrast, the Skanska Defendants maintained no employment records for Navar. (Novak Decl. ¶ 19.)

## IV. WALSH IS NOT A JOINT EMPLOYER OF ROBERTSON.

Despite a weighty discovery record, there is no support for any claim that Walsh employed Robertson. Instead, the record is clear that Robertson was employed by Skanska Building. It is against Skanska Building, and Skanska Building alone, that Robertson's claims should proceed.

### A.  Walsh Could Not (and Did Not) Hire or Fire Robertson.

The record makes clear that Robertson fails to meet the first *Carter* factor—Walsh had no power to hire or terminate Robertson. *Carter*, 735 F.2d at 12. It is Robertson's own testimony that is most fatal to this factor. Robertson submitted two separate employment applications to the Skanska Defendants, admitting that on each, the word "Walsh" was wholly absent. (Ex. D, Rob. Dep. 82:25-83:13). Robertson admitted that she never submitted a separate job application

directly to Walsh for her work on the LaGuardia Project. (Ex. D, Rob. Dep. 82:25-83-19.) Robertson also could not affirmatively state whether she interviewed with any Walsh employees. (Ex. D, Rob. Dep. 18:24-19:15.) Robertson's own signature on an offer letter from Skanska Building (within which Robertson admitted "Walsh" was again absent), made clear she understood her employer to be Skanska Building. (Ex. L.) Robertson acknowledged and understood that this offer letter required her to abide by the policies of Skanska and made no mention of policies of Walsh. (Ex. D, Rob. Dep. 84:22-85:1.)

Similarly, when Robertson resigned (on two occasions), she did so by notifying a Skanska Defendant employee. Robertson first resigned by notifying Skanska's Scott Silverman. (Ex. D, Rob. Dep. 40:4-41:5, 42:25-43:12; Silverman Decl. ¶ 17.) In March 2018, Robertson resigned for a second and final time—again, reaching out to Silverman. (Ex. O.) In her e-mail, sent only to Silverman, Robertson stated "[m]y last date *with Skanska USA Building* is April 5, 2018." (Ex. D, Rob. Dep. 105:15-24; Ex. O.) (emphasis added). Robertson went on to write that her "long term goal was to stay with Skanska as long as they would have me" and tellingly, did not mention Walsh at all. (Ex. O.)

Here, it is the facts applied to the law that make clear Walsh could not and did not involve itself in the hiring or termination of Robertson, mandating that this factor weigh against Robertson's claims of joint employment.[9]

---

[9]   In a similar vein and despite initial unsupported speculation, Robertson admitted that when Walsh's Piscopo assisted with hiring for the group to which Robertson was assigned, it "wasn't [Robertson's] concern" as to who would pay the employee. (Ex. D, Rob. Dep. 103:2-16.) Thus, any claim by Robertson that Piscopo hired employees for the Skanska Defendants is unsupported. Similarly detrimental to any unsupported speculation by Robertson are her admissions that, in this context, she never discussed with Piscopo who would pay the salaries of the employees hired to this group, never identified a certain employee as a Walsh employee and never identified a certain employee as a Skanska employee. (Ex. D, Rob. Dep. 104:19-105-5.) Piscopo did not and does not have the authority to hire people on behalf of either of the Skanska Defendants. (Ex. E, Twidwell Dep. 22:2-15.)

**B. Walsh Could Not (and Did Not) Supervise Robertson, Control Her Work Schedule or Control the Conditions of Her Employment.**

Support for the second *Carter* factor, which requires that Walsh supervise and control Robertson's work schedule or conditions of employment is similarly lacking in the record. *Carter*, 735 F.2d at 12. Again, Robertson's own testimony is telling. Robertson admitted that she never reported directly to anyone who was employed by Walsh. (Ex. D, Rob. Dep. 101:25-102:3). Rather, Robertson reported to Richard Pomaville, who was employed by Skanska Building, and later to Skanska Civil's Scott Silverman. (Ex. L; Silverman Decl. 16; Ex. D, Rob. Dep. 54:4-5.) By Robertson's own admissions, it was Pomaville and Silverman who completed Robertson's two performance reviews during her employment. (Ex. D, Rob. Dep. 65:5-22; 66:19-67:8.) These reviews were, to Robertson's knowledge, created without input from any Walsh employee. (Ex. D, Rob. Dep. 66:1-18, 67:17-68:3.) It is thus unsurprising that Robertson admitted during the time she served as Document Control Manager and Director, no Walsh employees reported to her and she did not complete any performance evaluations for Walsh employees. (Ex. D, Rob. Dep. 51:9-19.) Where the facts are clear that Walsh did not supervise Robertson and Robertson, in turn, did not supervise Walsh employees, Robertson's claims of joint employment fail under this factor. *Carter*, 735 F.2d at 12.

**C. Walsh Was Not Involved with Robertson's Compensation.**

Turning to the third factor—which requires that Walsh determine the rate and method of payment—Robertson's testimony again cuts her claim off at the pass. *Carter*, 735 F.2d at 12. Despite adjustments to her salary throughout her employment, only Skanska Building issued Robertson's paychecks, through her final paycheck. (Ex. D, Rob. Dep. 14:3-6, 93:16-22.) To receive these paychecks, Robertson submitted a form authorizing Skanska to deposit her paycheck into her identified bank account; Robertson testified she never provided Walsh with

23

such access. (Ex. D, Rob. 93:2-10.) Consistent payment by Skanska Building alone cannot support a claim that Robertson was jointly employed by Walsh. *Murphy*, 254 F.Supp.3d at 401 (joint employment found where, among other things, employee received paycheck from two employers). Similarly, only Skanska Building provided Robertson with benefits, including medical and dental. (Ex. D, Rob. Dep. 94:3-15; 101:3-6.) Walsh did not offer or provide any benefits to Robertson during her employment with Skanska Building. (Ex. D, Rob. Dep. 101:7-14.)

Just as Skanska Building paid Robertson, it was solely responsible for changes to her pay. In November 2016, when Robertson requested a raise she made that request to Skanska. (Ex. D, Rob. Dep. 40:12-45:10.) As a result, Skanska Building employee Brian Tighe and Silverman met with Robertson and offered Robertson an increase in her salary, which she accepted. (Ex. D, Rob. Dep. 44:9-22, 45:7-10.) Walsh again had no say regarding the decision to increase Robertson's salary. (Twidwell Decl. ¶ 12.) In the summer of 2017, Robertson's salary increased to $100,000 per year. That was made by all employees of Skanska. (Ex. N; Ex. A, Novak Dep. 61:14-62:20.) Walsh employees were merely informed of the change, as required by the JVA. (Ex. A, Novak Dep. 62:25-63:14; Ex. B, JVA Ex. E, n.7.) Because Walsh did not set Robertson's pay, Plaintiffs fail on this factor as well.

### D.  Walsh Did Not Maintain Employment Records of Robertson.

The final *Carter* factor also weighs against joint employment. That factor—which requires that Walsh maintain employment records of Robertson—is wholly lacking. *See Carter*, 735 F.2d at 12. Walsh does not maintain any employment records for Robertson. (Twidwell Decl. ¶ 14.) Further support for this are Robertson's own admissions that she submitted her employment paperwork to Skanska Building, the only entity that maintained her employment records. (Ex. D, Rob. Dep. 63:2-14, 90:12-93:10.)

## CONCLUSION

The record makes clear that Walsh and the Skanska Defendants are independent businesses who employed, managed and compensated Plaintiffs separately. It follows that keeping Plaintiffs' claims together would prejudice all Defendants. This Court should exercise its "broad discretion to sever claims and parties," *Merrill Lynch*, 214 F.R.D. at 155, and allow each Plaintiff to proceed only against her respective singular former employer. For these reasons, the Defendants respectfully request that the Court grant their motion to sever the claims asserted by Plaintiffs Navar and Robertson.


Dated: April 1, 2019

KELLEY DRYE & WARREN LLP                       LITTLER MENDELSON, P.C.


By: */s/ Mark A. Konkel*                       By: */s/ Amber M. Spataro*
   Mark A. Konkel                                 Amber M. Spataro (admitted *pro hac vice*)
   Alyssa M. Smilowitz                            Jacqueline E. Kalk (admitted *pro hac vice*)
   101 Park Avenue                                Benjamin D. Sandahl (admitted *pro hac vice*)
   New York, New York 10178                       One Newark Center, 8th Floor
   mkonkel@kelleydrye.com                         Newark, New Jersey 07102
   asmilowitz@kelleydrye.com                      aspataro@littler.com
   Phone: (212) 808-7800                          jkalk@littler.com
   Facsimile: (212) 808-7898                      bsandahl@littler.com
   *Attorneys for Defendant Walsh Construction*   Phone: (973) 848-4700
   *Company II, LLC*                              Facsimile: (973) 643-5626
                                                  *Attorneys for Defendants Skanska USA*
                                                  *Civil Northeast Inc. and Skanska USA*
                                                  *Building Inc.*