**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
**ALLISON NAVAR and CAMILLE ROBERTSON, on**
**behalf of themselves and others similarly situated,**

                   **Plaintiffs,**

            **-against-**

**WALSH CONSTRUCTION COMPANY II, LLC,**
**SKANSKA USA CIVIL NORTHEAST, INC., and**
**SKANSKA USA BUILDING, INC.,**

                   **Defendants.**

-------------------------------------------------------------------------x

        **NO.:  18-CV-10476 (LGS)**

---

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR**
**CONDITIONAL CERTIFICATION OF AN EQUAL PAY ACT COLLECTIVE ACTION**

---

**JOSEPH & KIRSCHENBAUM LLP**

D. Maimon Kirschenbaum
Lucas C. Buzzard
32 Broadway, Suite 601
New York, NY 10004
Tel: (212) 688-5640

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. i

I.    PRELIMINARY STATEMENT ................................................................................... 1

II.   PROCEDURAL HISTORY ........................................................................................ 1

III.  FACTUAL BACKGROUD ......................................................................................... 2

A.   Plaintiffs Bring the Proposed Collective Action on Behalf of All Female Employees of
     Defendants Who Worked in Site-Wide "Coordination" Groups at the Joint Venture ......... 2

B.   Compensation at the Joint Venture is Determined Through a Centralized Process
     Involving all Three Defendants ......................................................................................... 2

     1. *Defendants' Joint Venture & Joint Venture Agreement* ................................................ 2

     2. *Organizational Structure of the Joint Venture* ............................................................ 4

          a. *Executive Committee* ............................................................................................ 4

          b. *Project Officer, Deputy Project Officers & Chief of Staff* ............................ ..4

          c. *JV Organizational Charts and Functional Groups* ........................................... 5

     3. *JV Project Staff Hiring, Salaries & Promotions* ............................................................ 7

C.   Under Defendants' JV-Wide Compensation Process, Female Employees Were Paid Less
     than Men for Substantially Equal Work ......................................................................... 12

     1. *Plaintiffs have Alleged and Presented Evidence that Women in the Coordination Group
        were Paid less than Male Comparators who Performed Substantially Equal Work*..... 14

     2. *Plaintiffs have Identified Numerous Instances of Female JV Employees in the
        Coordination Groups Being Paid Less Than Male JV Employees with the Same JV
        Job Titles* ...................................................................................................................... 15

     3. *Women Hired or Promoted into Roles Previously Held by Men Were Paid Less than
        the Former Male Occupants of those Positions* ............................................................ 17

     4. *Defendants Changed Job Titles to Hire Women at Less Senior Positions* ................... 17

IV.   ARGUMENT ............................................................................................................. 18

A.   Legal Standard for Conditional Certification and Court-Authorized Notice .................. 18

B.   Plaintiffs Have Made the Modest Factual Showing Required for Conditional
     Certification ................................................................................................................... 20

C.   The Underlying Merits of the Case Are Immaterial to the Determination of Conditional
     Certification and Notice .................................................................................................. 22

D.   The Fact that Plaintiffs May have had Different Job Functions than Some Members
     of the Putative EPA Collective is Not Material at the Notice Stage................................ 23

V.    CONCLUSION .......................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Alonso v. Uncle Jack's Steakhouse, Inc.*, 648 F. Supp. 2d 484 (S.D.N.Y. 2009) ............ 18

*Barrett v. Forest Labs., Inc.*, No. 12-cv-5224(RA)(MHD),
    2015 U.S. Dist. LEXIS 117203 (S.D.N.Y. Sept. 2, 2015) ................................... 19, 22, 25

*Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638 (S.D.N.Y. 2010) ............... 23

*Davis v. Abercrombie & Fitch Co.*, No. 08 Civ. 1859,
    2008 U.S. Dist. LEXIS 86577 (S.D.N.Y. Oct 23, 2008) ..................................... 22

*Diaz v. S&H Bondi's Dep't Store, Inc.*, No. 10-cv-7676 (PGG),
    2012 U.S. Dist. LEXIS 5683 (S.D.N.Y. Jan. 18, 2012) ....................................... 23

*EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247 (2d Cir. 2014) ................................... 14

*Gaspar v. Personal Touch Moving, Inc.*, No. 13-cv-8187(AJN),
    2014 U.S. Dist. LEXIS 129856 (Sept. 15, 2014) ................................................. 22, 25

*Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165 (1989); ............................................... 18

*Husser v. New York City Dep't of Educ.*, 12-cv-6095,
    2015 U.S. Dist. LEXIS 134260 (E.D.N.Y. Sept. 15, 2015) ................................. 14

*Kassman v. KPMG LLP*, No. 11-cv-3743 (LGS),
    2014 U.S. Dist. LEXIS 93022 (S.D.N.Y. July 8, 2014) ....................................... *passim*

*Knox v. John Varvatos Enters.*, 282 F. Supp. 3d 644 (S.D.N.Y. 2017) ........................... 19

*Myers v. The Hertz Corp.*, 624 F.3d 537 (2d Cir. 2010) ................................................... 19

*Tomka v. Seiler Corp.*, 66 F.3d 1295 (2d Cir. 1005) ....................................................... 14

*Wellens v. Daiichi Sankyo, Inc.*, No. 13-cv-581(WHO),
    2014 U.S. Dist. LEXIS 70628, at *8, 17-19 (N.D. Cal. May 22, 2014) .............. 23

**Statutes, Rules, and Regulations**

29 U.S.C. §§ 206(d) ...................................................................................................... 1, 18

29 U.S.C. § 216(b) ........................................................................................................... 18

## I.        PRELIMINARY STATEMENT

Plaintiffs Allison Navar and Camille Robertson respectfully request that the Court conditionally certify an Equal Pay Act collective and authorize the distribution of notice to members of the collective. As demonstrated below, Plaintiffs and other female employees working at Defendants' Joint Venture ("JV") for the redevelopment of LaGuardia airport are all subject to a centralized set of compensation processes subject to the approval of the JV project and deputy project officers. Through detailed statistical analyses and numerous specific examples of pay disparities between men and women, Plaintiffs show that, as a result of these compensation processes, "they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Kassman v. KPMG LLP*, No. 11-cv-3743 (LGS), 2014 U.S. Dist. LEXIS 93022, at *13 (S.D.N.Y. July 8, 2014).

## II.       PROCEDURAL HISTORY

Plaintiffs' Complaint, filed on November 12, 2018, alleges, *inter alia*, violations of the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA") at Defendants' Joint Venture ("JV") for performing the design and construction work for the redevelopment of LaGuardia Airport.  *See* ECF No. 1 (Compl.). In January 2019, this Court granted Defendants' request to conduct expedited discovery on whether they are joint employers under the EPA. *See* ECF Nos. 29, 34. In mid-August 2019, the Court denied Defendants' resulting motion to sever. *See* ECF No. 62. Shortly thereafter, the parties held a meet and confer during which Defendants: (a) proposed a phased approach to the remaining discovery in this action, and (b) asked Plaintiffs to hold in abeyance those of their already-served discovery requests related only to the merits. Under this approach, the parties would first conduct "limited discovery related to class/collective certification, and then, after the Court rules on Plaintiffs' motion(s) for class/collective certification, the parties proceed to merits-based

1

discovery." ECF No. 63 at 1. Plaintiffs agreed to Defendants' suggestion. The Court granted the

parties' application for phased discovery on August 21, 2019. ECF No. 64.

## III.    FACTUAL BACKGROUND

### A.    Plaintiffs Bring the Proposed Collective Action on Behalf of All Female Employees Who Worked in Site-Wide "Coordination" Groups at the JV

In their instant motion, Plaintiffs seek conditional certification of an EPA Collective

consisting of all female employees of any Defendant who: (1) have been assigned to work at the

JV at any time since November 12, 2015 (a date three years before the filing of the Complaint in

this action); and (2) worked on any of five site-wide "coordination" groups at the JV – (a)

Environmental, Health & Safety, (b) Quality, (c) Design/Build Management, (d) Commercial

Management, or (e) Financial (which contains the sub-groups of Project Controls, Business

Management, Project Accounting & Finance). Based on the employee data produced by

Defendants in discovery for the above Coordination groups for sample time periods, there are at

least 65 individuals who meet this definition. *See* Buzzard Decl., Ex. 5 (Salary Analyses).

### B.    Compensation at the Joint Venture is Determined Through a Centralized Process Involving all Three Defendants

#### 1.    Defendants' Joint Venture & Joint Venture Agreement

In March 2015, Defendants entered into a Joint Venture Agreement ("JVA") to form a joint

venture for the purposes of submitting a bid for and then completing the construction of a

redevelopment project at LaGuardia Airport. *See* Buzzard Decl., Ex. 1 (JVA Excerpts).[1] The JVA

remains in effect and the record demonstrates that Defendants organized and operated the JV in

accordance with its terms. *Id.*, Ex. 6 (Twidwell 3.2019 Dep.) at 7:24-8:4. The JV is responsible for

_____

[1] Plaintiffs cite to the numbered exhibits attached to the January 17, 2020 Declaration of Lucas C. Buzzard, which are hereinafter referred to as "Buzzard Decl., Ex.__". Citations to the transcripts pages of individual deposed in this case are designated by the deponent's last name. If a witness has been deposed more than once, the citation identifies month the referenced deposition occurred.

completing a design/build contract between Defendants and LaGuardia Gateway Partners. *Id.*, Ex. 8 (Novak Dep.) at 12:17-13:8.

Under the JVA, each Defendant holds a "proportionate share" of the JV – Walsh holds 30%, while Skanksa Building and Skanksa Civil each holds 35%. Buzzard Decl., Ex. 1 (JVA) § 3.1. The proportionate shares dictate the extent of each Defendant's interest in, and obligation to, the JV. *Id.* §§ 3.1, 7.1. At the culmination of the project, each Defendant will receive its proportionate share of any profits derived (or bear its proportionate share of any losses), and each Defendant will own its proportionate share interest in any assets, equipment, or property acquired by the JV. *See id.* § 3.1. The proportionate shares also dictate each Defendant's obligation to the JV with respect to the provision of project staff. Buzzard Decl., Ex. 1 (JVA) § 6.2; *id.*, Ex. 6 (Twidwell 3.2019 Dep.) at 13:21-14:5. Each Defendant is expected to furnish a portion of the key managerial staff and other project staff that is "reasonably commensurate" with its share. *Id.*

The salaries paid to all JV project staff are treated as an expense incurred by the JV. Buzzard Decl., Ex. 1 (JVA) § 11.1. When the profits of the JV are calculated at the culmination of the LaGuardia project, the cost of all salaries will be deducted from the final contract price. *Id.* After each Defendant bills the JV on a monthly basis for the salary cost of all personnel it has provided, Buzzard Decl., Ex. 7 (Twidwell 3.2019 Dep.) at 57:9-11, 58:6-7, its monthly invoices are sent to an "accounting team" composed of a representative from each Defendant, *id.*, Ex. 8 (Novak Dep.) at 40:6-9. This accounting team has an "approved list" of each Defendant's employees whose salaries can be charged to the JV and is responsible for reviewing the invoices to ensure the propriety of all staff charges. *Id.* at 41:2-16. After that initial review by the accounting team, the invoices are reviewed and approved by the JV Project Officer, who has authority to dispute any charges. *Id.* at 40:9-14.

### 2. Organizational Structure of the Joint Venture

#### a. *Executive Committee*

The highest decision-making body of the JV is an Executive Committee composed of one representative from each Defendant. Buzzard Decl., Ex. 1 (JVA) § 4.1. Some Executive Committee decisions must be unanimous. *See id.*, § 4.2(a). Pursuant to a "Project Authority Matrix" that "governs the level of authority granted to individual members of the Project team," one such decision that requires unanimity is the "hiring, substitution, or termination" of "Key JV Personnel." *Id.* § 4.2(b) & Exhibit E (Project Authority Matrix), line 31. These "key" personnel include the Project Officer and Deputy Project Officers of the JV. *Id.* at Exhibit C.

#### b. *Project Officer, Deputy Project Officers & Chief of Staff*

The JVA specifies that Skanska Building will designate a Project Officer who is responsible for "the performance and completion" of the redevelopment work. *See* Buzzard Decl., Ex 1 (JVA) §§ 5.1, 6.1. The Project Officer "serve[s] at the Executive Committee's pleasure and [is] subject to its control." *Id.* § 6.1. All other personnel at the JV "serve under the authority of the Project Officer," who "shall have the authority to make personnel and other Project execution decisions." *Id.* § 6.2. The JVA delineates the Project Officer's authority to remove or replace personnel supplied by Skanksa Civil or Walsh. *See id.* ("In the event the Project Officer requests the removal and/or replacement of any personnel, the Project Officer may require the Party to replace the team member with a suitable replacement as determined by the Project Officer in his reasonable discretion.").Thomas Nilsson, an employee of Skanksa Building, is the Project Officer. Buzzard Decl., Ex. 8 (Novak Dep.) at 22:21-23:12.

Directly below Nilsson are two Deputy Project Officers—Vince Piscopo of Walsh and Mike Attardo of Skanksa Civil. *See* Buzzard Decl., Ex. 1 (JVA) at Exhibit C. The Project Authority

Matrix specifies that both the Project Officer and the Deputy Project Officers have authority to make decisions as to the "hiring, substitution, or termination of management personnel" at the project. *See* Buzzard Decl., Ex. 1 (JVA) at Exhibit E (Authority Matrix), line 31. The Project Officer and Deputy Project Officers "have a duty to inform each other with respect to all [such] decisions," and any "major objections" must be resolved by unanimous vote of the Executive Committee. *See id.* at Ex. E (Authority Matrix) at line 31 & fn. 7.

The JV also has a Chief of Staff, John Novak of Skanksa Building. His responsibilities include ensuring that the project is sufficiently staffed by all three Defendants. Buzzard Decl., Ex. 8 (Novak Dep.) at 10:13-21.

### c.  JV Organizational Charts & Functional Groups

One of Mr. Novak's other responsibilities is to maintain an organizational structure that is reflected on organizational charts prepared by his office for the JV. *See* Buzzard Decl., Ex. 8 (Novak Dep.) at 50:16-51:6. The organizational charts, which are updated periodically, show the relationships between employees on the JV, and generally "depict[] how the organization will work." Buzzard Decl. Ex. 9 (Silverman Dep.) at 14:17-23; *see also id.*, Ex. 4 (Org. Charts). Project Officer Nilsson appears at the top of the charts with "lines of authority" (depicted by lines and arrows) running down from him to all other members of the JV project staff. *E.g.* Buzzard Decl., Ex. 4 (Org. Charts). These lines show the authority of certain JV staff members to issue "direction of day-to-day tasks" to other, lower members of the JV staff. *Id.*, Ex. 8 (Novak Dep.) at 52:11-17.

All JV project staff are arranged into "functional groups" depicted on the organizational charts. *See, e.g.*, Buzzard Decl., Ex. 4 (Org. Charts). In general, the JV is divided into those functional groups that perform an "operational" role on the project (generally color-coded blue on the organizational charts) and those that perform a "coordination" or "support" role (generally

color-coded green on the organizational charts). *Id.*, Exs. 7 (Twidwell 12.2019 Dep.) at 8-9; 9 (Silverman Dep.) at 16:25-17:3. The "operational" groups have specific scopes of work, with direct responsibility for the construction of certain parts of the larger project. *Id.* at 17:10-18:2. The "coordination" groups, by contrast, support the operational groups by providing site-wide services to the project as a whole. *See id.* One relevant exception to this general rule is the Design/Build Management group, which is color-coded blue on the JV organizational charts but provides project-wide services rather than being responsible for a specific scope of work. *See id.* at 66:21-67:6. The groups at issue for purposes of this collective certification motion are all "coordination" groups, and consist of: (1) Environmental, Health & Safety ("EHS"), (2) Quality, (3) Design/Build Management, (4) Commercial Management, and (5) Financial (which is further subdivided into the Project Controls, Business Management, and Project Accounting & Finance sub-groups). *See, e.g.*, Buzzard Decl., Ex. 4 (Org. Charts).[2]

Each of these functional groups has a leader. *See, e.g. id.* (showing, for example, that Christopher Golden led the EHS group). The Project Officer has authority to, and does, direct these functional group leaders to perform specific tasks. *See* Buzzard Decl., Ex. 8 (Novak Dep.) at 97:20-98:4. The functional groups themselves are composed of individuals that are completely diverse with respect to their formal employers (*ie.*, Skanksa Building, Skanksa Civil, or Walsh). In October 2017, for example, the Commercial Management group had 15 individuals—six from Walsh and nine from the Skanksa entities. *See id.*, Ex. 5 (JV Salary Analyses) at 10.2017 Spreadsheet. This diversity was by design—Navar testified that a Skanksa employee was brought onto her commercial team, which up to that point had been an all-Walsh team, in order to "diversify" the

---

[2] Mr. Twidwell provided a general description of these functional groups (and the sub-groups under Financial) and their role on the project.  *See* Buzzard Decl., Ex. 7 (Twidwell 12.2019 Dep.) at 16-17 (Quality), 35-36 (EHS), 36-38 (Design/Build Management), 38-41 (Commercial Management), 42-47 (Project Controls), 47-50 (Business Management), 50-52 (Project Accounting & Finance).

team. *Id.*, Ex. 10 (Navar 3.2019 Dep.) at 98-100. Indeed, at the project level, it was often unknown which individuals were formally employed by which Defendant. The organizational charts do not identify the formal employer of any individual on the JV. *See* Buzzard Decl., Ex. 4 (Org. Charts). Plaintiff Roberston testified that unless someone wore a company-specific vest, she did not know who on the project was employed by Walsh and who was employed by the Skanksa entities. *Id.*, Ex. 11 (Robertson 3.2019 Dep.) at 56:8-22. The JV, in short, was organized and operated based on the "functionality" of the work each individual performed, not on any company-specific hierarchy. *Id.* at 52-53, 54-55.

The functionality of employees' work at the JV is captured, at least in a general sense, by their JV-specific job title as set forth on the organizational charts (which may differ from the job title provided by the individual's formal employer). The JV-specific job title is "a depiction of [an individual's] responsibilities as far as the Joint Venture is concerned." Buzzard Decl., Ex. 9 (Silverman Dep.) at 85:22-86:3. Put another way, a JV-specific job title "communicates the general type of work" that an individual performs on the project, *id.* at 95:17-25, and the determination of which job title to assign is based on the type of responsibilities the individual is expected to perform, *id.* at 89:5-14. *See also* Buzzard Decl., Ex. 7 (Twidwell 12.2019 Dep.) at 14 (organizational chart is a "communication tool" that informs the JV staff "who's there and generally what they are working on").

### 3.  JV Project Staff Hiring, Salaries & Promotions

Each functional group on the JV has an initial budget for personnel salary costs that was established in Defendants' joint original bid for the LaGuardia project. Buzzard Decl., Ex. 9 (Silverman Dep.) at 44:12-20, 45:15-16, 47:8-12. The functional group leader is responsible for

the salary costs within his[3] group, *Id.*, Ex. 8 (Novak Dep.) at 88-89, and for ensuring that his group operates within either (a) the initial budget or (b) the current approved "salary forecast," *id.*, Ex. 9 (Silverman Dep.) at 47:13-18. A "salary forecast" projects out the total expected cost to the JV for staff salaries by combining the current compensation paid to JV project staff members with the expected duration of their respective positions. *Id.* at 42:5-14. Any variance between a group's initial budget and its current salary forecast must be approved by the three Project Officers. *Id.* at 44:18-45:5, 47:19-48:1.

Functional group leaders are also responsible for identifying the staffing needs for their respective groups. Buzzard Decl., Ex. 7 (Twidwell 12.2019 Dep.) at 20-21, 34. The JV maintains a staffing "needs list" that lists the positions to be filled on the project. *Id.* at 23, 31. Once a position is placed onto the needs list, any of the Defendants can fill that position with someone they either hire specifically for the JV or transfer from one of their other jobs. *Id.* at 31:21-32:3.

Project Officers approve the details of any new hires or transfers to the JV, including the salary to be paid to the new hire/transferee. For example, Walsh offered Plaintiff Navar the position of Claims Project Engineer on the LaGuardia Project in early December 2016. *See* Buzzard Decl., Ex. 39 (Offer Letter). Prior to that offer, Navar was informed by her future supervisor on the JV that her "compensation would have to be run through the Joint Venture" and "be approved by the Skanska and the Walsh persons." *Id.*, Ex. 19 (Navar 3.2019 Dep.) at 52:4-16, 52:25-53:11, 53:19-24. On December 7, 2016, Vince Piscopo – the Walsh Deputy Project Officer – sent an email to Lisbeth Acosta, a human resources officer formally employed by one of the Skanksa entities, *see* Buzzard Decl., Ex. 3 at Skanksa1952, regarding "current, pending and near future Walsh transfers and new hires," *id.*, Ex. 14 (Walsh Emails) at Walsh112. Attached to that email was a spreadsheet

---

[3] At all sample time periods, all the leaders of the five relevant functional groups (EHS, Quality, Design/Build Management, Commercial Management, and Financial) were men. *See* Buzzard Decl., Ex. 4 (Org. Charts).

containing position and salary data for approximately 19 Walsh new hires or transfers, including Plaintiff Navar whose salary was listed in the "REDACTED range." *See id.* In his email, Piscopo stated that Project Officer Nilsson had "approved the plan" set forth in the attachment. *Id*. The same day Piscopo sent this email confirming Nilsson's approval of the Walsh "plan," Walsh offered Navar the position, with a starting salary of REDACTED *Id*. at Walsh548.

Plaintiff Robertson was hired by Skanksa Building at as a Document Control Manager at the JV in July 2016. Buzzard Decl., Ex. 11 (Robertson 3.2019 Dep.) at 60:22-25; *id.*, Ex. 13 (Skanska Emails) at Skanska1176. In a June 22, 2016 email, Richard Pomaville, the JV's Document Control Director and an employee of Skanksa Building, asked a human resources employee to "make a move to offer [Robertson] the position of Document Control Manager." *Id.*, Ex. 13 (Skanska Emails) at Skanska1176. Although Pomaville noted that Plaintiff Robertson was earning REDACTED in her current position, he asked the human resources employee to "work [her] 'talent' to get [Robertson] at the best cost within our target." *Id.* According to Scott Silverman, the JV's Project Financial Officer, Pomaville's mention of "our target" referred, at least in part, to the "initial budgets" discussed above, Buzzard Decl., Ex. 9 (Silverman Dep.) at 176:15-25, which were established by the parties' joint bid for the LaGuardia project, *id.* at 44:12-20, 45:15-16, 47:8-12. Ms. Robertson's name, JV job title, project start date, and salary of REDACTED ($3,000 less than she was making in her prior position), later appeared on an August 18, 2016 staffing "Approval List." Buzzard Decl., Ex. 15 (Approval Lists). The August 2016 approval list is signed by all three Project Officers and states that the individuals on the list "have been approved to work on and bill the [Skanksa Walsh JV] project as of date specified above as project start date." *Id.* The Skanksa Defendants have produced, in redacted form, five similar approval lists spanning the period from March 2016 to December 2017. *See id.*; *see also* Buzzard Decl. ¶ 18.

This process, whereby the three project officers jointly approved staffing and salary details of new hires and transfers to the JV was routinely followed. Mr. Silverman testified that when it came to the hiring of new employees or the transfer of existing employees to the project, the approval of the Project Officer and Deputy Project Officers was obtained via emails sent to all three project officers. Buzzard Decl., Ex. 9 (Silverman Dep.) at 183:24-184:1, 196:14-197:1. He further confirmed that these emails contained the salary information of the new hire/transferee. *Id.* at 197:5-18. There are numerous examples of this practice.

In early 2018, after Plaintiff Robertson had been promoted to Document Controls Director and was interviewing candidates for a position in her division, Mr. Piscopo of Walsh attended several of those interviews and his "input was sought as far as the salary was concerned." Buzzard Decl., Ex. 11 (Robertson 3.2019 Dep.) at 30:22-31:17. On February 5, 2018, a human resources employee emailed the three project officers the specifics of a contemplated offer to Samantha Little for the position of Document Control Coordinator with a salary of REDACTED *Id.*, Ex. 13 at Skanksa1755. The email stated that "[w]e are seeking approval to make the following offer to Samantha Little, on behalf of Skanksa USA Building." *Id.* The following day, February 6, 2018, the same human resources employee emailed Plaintiff Robertson that "[w]e are all approved on Samantha Little," and were "approved at or up to REDACTED" *Id.* at Skanska1754. Several days later, Ms. Little complained that the position she had been offered was not the position she had interviewed for, which had been Document Control Manager. *See id.* at Skanksa1737. On February 15, 2018, a human resources official informed Plaintiff Roberson that after discussing the issue with Mr. Silverman (an employee of Skanksa Civil), the position offered to Ms. Little would remain Document Control Coordinator, but the compensation would be increased from REDACTED to REDACTED *See id.* at Skanksa1731. On February 21, 2018, another email was sent to the three project

10

officers that detailed the specifics of the revised offer, including the ▮REDACTED▮ salary, again seeking their "approval to make the following offer on behalf of Skanska USA Building to Samantha Little." *Id.* at Skanska96.

In January 2018, Walsh sought to fill the position of Contracts Manager in the JV's Commercial Management functional group by offering the position to Jill Bramwell. *See* Buzzard Decl., Ex. 14 at Walsh1736-38. This position had been previously occupied by Kevin Pfeiffer who had a salary of ▮REDACTED▮ as of December 2017. *See Id.*, Ex. 7 (Twidwell 12.2019 Dep.) at 117:13-22; *id.*, Ex. 3 (Walsh Salary Chart) at 26. In a January 3, 2018 email, Mr. Piscopo asked a Walsh human resources employee "to obtain Skanksa approvals to release th[e] offer letter" to Ms. Bramwell. Buzzard Decl., Ex. 14 at Walsh1736. Mr. Piscopo attached the terms of the proposed offer, which included a salary of ▮REDACTED▮ – $5,000 less than that received by Mr. Pfeiffer in the same position. *See id.* at Walsh1738. On January 4, 2018, an email was sent to the three project officers "seeking approval to make an offer to Jill Bramwell, on behalf of Walsh Construction" with a salary of ▮REDACTED▮. Buzzard Decl., Ex. 13 at Skanksa1633-34. All three project officers approved the offer, *id.* at Skanksa1632-33, and Ms. Bramwell joined the JV with a salary of ▮REDACTED▮, *see* Buzzard Decl., Ex. 3 (Walsh Salary Chart) at 20.

There is also evidence that the three project officers jointly approve promotions and salary increases for project staff. The initial decision to promote Plaintiff Robertson to Document Control Director in the summer of 2017 to replace Richard Pomaville was made by a group that included Scott Silverman (Skanska Civil). *See* Buzzard Decl., Ex. 8 (Novak Dep.) at 61:14-25, 62:25-63:11. In a July 25, 2017 email, Mr. Silverman approved the terms of Ms. Robertson's proposed promotion, including the annual salary of ▮REDACTED▮ *Id*., Ex. 13 at Skanksa1891. Mr. Pomaville's salary when he held the same position was ▮REDACTED▮ *See* Buzzard Decl., Ex. 2 at Skanksa1951.

After approving the terms of Ms. Robertson's offer, Mr. Silverman in his July 25, 2017 email stated that "[w]e need to get approval from Thomas [Nilsson], Vince [Piscopo], and Mike [Attardo] to finalize." *Id.*, Ex. 13 at Skanska1891; *see also id.*, Ex. 9 (Silverman Dep.) at 181:21-182:7. Later that same day, an email was sent to the three project officers "seeking approval to promote Camille Robertson" to Document Controls Director with a salary of REDACTED. Buzzard Decl., Ex. 13 at Skanksa1887. It was only after the promotion had been "approved by the project and home office" that authorization to communicate the promotion to Ms. Robertson was given. *Id.* at Skanksa1844. The letter notifying Robertson of her promotion was sent on JV letterhead on "behalf of the Skanksa Walsh/LGA Project Management team" and was signed by Silverman of Skanksa Civil. *Id.* at Skanska15. A similar email approval process involving the three project officers was followed in November 2017, when Ms. Robertson's salary was increased to REDACTED *Id.* at Skanska1690.

## C.   Under Defendants' JV-Wide Compensation Process, Female Employees Were Paid Less than Men for Substantially Equal Work

As noted above, Plaintiffs have not yet conducted discovery into the merits of their EPA claims or the claims of members of the EPA Collective.  Even on the partially developed record, however, there is overwhelming evidence that the compensation processes described above resulted in significant pay disparities between male and female employees in the five Coordination functional groups at project-wide, group-wide, and individual levels. Using the salary and gender information supplied by Defendants for sample time periods (November 2016, March 2017, October 2017, and September 2018), and comparing that data to the job title information set forth in the corresponding organizational charts for the same periods, Plaintiffs have produced spreadsheets detailing the salary practices in the Coordination groups for each period. *See* Buzzard Decl. ¶ 8 & Ex. 5 (JV Salary Analyses).

At the project level, there are gaping disparities between the average salary earned by men and the average salary earned by women in the five Coordination groups.  In November 2016, there were 95 employees in the five groups for which all data is available – 63 men and 32 women. *See* Buzzard Decl., Ex. 5 at November 2016 Salary Analysis.[4] The 32 women had an average salary of $90,664 while the 63 men had an average salary of $131,042. *See id.* Analyzed differently, in November 2016, women accounted for 33.6% of the total employees in the five groups (32 out of 95). But of the 45 individuals in the groups who earned less than $100,000, 23 (or 51%) were women. And of the 53 individuals who earned more than $100,000, only 9 (or 16.9%) were women. Women were thus overrepresented in the lower salary levels and drastically underrepresented at the higher levels. This trend continues throughout all the sample periods.[5]

The numbers are just as stark at the group level.  For example, in October 2017, there were 14 employees in Plaintiff Navar's Commercial Management group for whom salary data is available – 2 women and 12 men. *See* Buzzard Decl., Ex. 5 at October 2017 Salary Analysis. While the average salary for the men was $163,726, the women's average salary was only $82,914. *Id.* During the same period, there were 23 employees in Plaintiff Robertson's Project Controls group

---

[4] Plaintiffs will provide the Court and/or Defendants with the Excel versions of their Salary Analyses upon request.

[5] In March 2017, there were 110 total employees in the five groups for whom all data is available – 35 women and 75 men.  *See* Buzzard Decl., Ex. 5 at March 2017 Salary Analysis.  The average salary for women was $90,388, while the average salary for men was $127,864. While women made up 31.8% of the total number of employees (35 out of 110), they accounted for 49% of those earning under $100,000 (26 of 53) and only 15.8% of those earning over $100,000 (9 of 57).  *See id.*

In October 2017, there were 118 total employees in the five groups for whom all data is available – 34 women and 84 men.  *See* Buzzard Decl., Ex. 5 at October 2017 Salary Analysis.  The average salary for women was $88,633, while the average salary for men was $119,670. While women made up 28.8% of the total number of employees (34 out of 118), they accounted for 40.6% of those earning under $100,000 (24 of 59) and only 16.9% of those earning $100,000 or more (10 of 59).  *See id.*

In September 2018, there were 109 total employees in the five groups for whom all data is available – 32 women and 77 men.  *See* Buzzard Decl., Ex. 5 at September 2018 Salary Analysis. The average salary for women was $89,745, while the average salary for men was $120,069. While women made up 29.4% of the total number of employees (32 out of 109), they accounted for 43.1% of those earning under $100,000 (22 of 51) and only 17.2% of those earning $100,000 or more (10 of 58).  *See id.*

– 7 women and 16 men. *Id.* The average salary for the women was $86,238, while the men earned, on average, $112,401. *Id.* Next, during this same period, the Design Build Management group was almost evenly split between males and females, with 5 women and 6 men. *Id.* Yet the average salary for men was $179,746 while the average salary for the women was $120,229. *Id.* And perhaps most egregiously, although in October 2017 the Business Management group had nearly twice as many women as men (10 women and 6 men), the average salary for the men was $95,650 while the average salary for the women was only $80,493. *Id.*

1. **Plaintiffs have Alleged and Presented Evidence that Women in the Coordination Groups were Paid less than Male Comparators who Performed Substantially Equal Work.**

The EPA was designed "to legislate out of existence a long-held, but outmoded societal view that a man should be paid more than a woman for the same work." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014). The statute "prohibits employers from discriminating among employees on the basis of sex by paying higher wages to employees of the opposite sex for equal work." *Husser v. New York City Dep't of Educ.*, 12-cv-6095, 2015 U.S. Dist. LEXIS 134260, *16 (E.D.N.Y. Sept. 15, 2015) (internal quotation marks omitted). To prove an EPA violation, a plaintiff must demonstrate that "(1) the employer pays different wages to employees of the opposite sex; (2) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) the jobs are performed under similar working conditions." *EEOC*, 768 F.3d at 254–55 (internal brackets and quotation marks omitted). To meet her burden, it is not necessary for a plaintiff to prove that the jobs are "identical," but rather that the "the jobs compared entail common duties or content, and do not simply overlap in titles or classification." *Id.*; *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 1005) (central concern of the EPA is "job content and not job title or description").

Here, Plaintiff Navar has alleged that shortly after beginning her employment at the JV, she shifted into a "Claims Management" position in which she worked alongside Kevin Pfeiffer, whose formal title was "Contract Manager." *See* Compl. ¶¶ 58-59. She has further alleged that she and Mr. Pfeiffer – who were both recent law graduates that began working at the JV within six months of one another and reported to the same supervisor (Jeff Twidwell) – had substantially the same job duties of (a) managing, maintaining, and organizing incoming and outgoing correspondence to maintain a proper evidentiary record and (b) researching and drafting entitlement positions related to project claims. *Id.* ¶¶ 58, 61. Indeed, Navar asserts that assignments were communicated to both her and Pfeiffer and the two decided together how to divvy them up. *Id.* ¶ 61. Yet despite their equivalent duties, Navar's salary was REDACTED in March 2017, while Pfeiffer's was REDACTED that same month. Buzzard Decl., Ex. 3 (Walsh Salary Data) at 4, 26.

Mr. Twidwell also testified that the same job description of Change Management Project Engineer I accurately described the responsibilities of both Milad Moradi and Kelsey Walls. Buzzard Decl., Exs. 16 (Twidwell 12.2019 Dep.) at 161:8-162:5. Despite their equivalent responsibilities, Mr. Moradi was paid REDACTED in October 2017, Buzzard Decl., Ex. 3 (Walsh Salary Data) at 40, while Ms. Walls (who joined the project later) received a salary of only REDACTED from February through October of 2018 (when it was increased to REDACTED ), *id.* at 24.

### 2. Plaintiffs Have Identified Numerous Instances of Female JV Employees in the Coordination Groups Being Paid Less Than Male JV Employees with the Same JV Job Titles.

As discussed above, the JV-specific job titles assigned to JV project staff depict their individual responsibilities with respect to the JV and communicate the general type of work that they perform on the project. *See supra* at 7. Thus, because the JV job titles convey information about the responsibilities and type of work performed by the holders of those titles, they can

provide a general point of comparison for EPA purposes, especially at this stage of discovery when no detailed discovery into specific job duties has yet taken place. Plaintiffs' salary analysis has revealed numerous disparities in pay between male and female employees on the JV who hold the same (or comparable) job titles.  In particular:

- In November 2016, there were five EHS Engineers for whom salary data is available in the EHS Group – John Kane (EHS Engineer Concourses), Daniel Hoover (EHS Engineer - W. Roadways), Kelsey Tiedemann (EHS Engineer - E. Roadways), Kent Franks (EHS Engineer - Headhouse), and Salvatore Sommeso (EHS Engineer WPG).  *See* Buzzard Decl., Ex. 3 at November 2016 Salary Analysis. The female EHS Engineer (Tiedemann) had a salary of REDACTED.  *Id.* The male EHS Engineers, by contrast, had salaries ranging from a low of REDACTED (Hoover) to a high of REDACTED (Franks).  *Id.*

- In November 2016, there were three Senior Project Accountants in the Project Accounting and Finance Group (which is a sub-group of the Financial functional group).  *See id.* Two were female (Manjit Kaur and Melissa Szesnat) and one was male (Mike Lesko). *Id.* The female Senior Project Accountants had salaries of REDACTED (Kaur) and REDACTED (Szesnat), while the male received REDACTED  *Id.*  Within the same group, there were two Project Accountants formally employed by Skanska – one male (Bryan Vivaro), who was paid REDACTED, and one female (Kimberly Femenias), who was paid only REDACTED. *Id.* These same disparities continued into March 2017. *See id.* at March 2017 Salary Analysis.

- In September 2018, there were three Senior Planners in the Project Controls Group (which is a sub-group of the Financial group).  *See* Buzzard Decl., Ex. 3 at September 2018 Salary Analysis. The two males were paid REDACTED (Mohammed Aly) and REDACTED (Tarkan Tantekin). *Id.* The female Senior Planner (Staci Kramer) was paid only REDACTED  *Id.*

- In September 2018, there were two Planners in the Project Controls group. The male (Arash Ghiashi) was paid REDACTED. *Id.* The female (Sara Hires) was paid REDACTED. *Id.*

- In September 2018, there were five Senior Cost Engineers in the Project Controls group. *See id.* The two females were paid salaries of REDACTED (Neha Sheth) and REDACTED (Kirsten Zinser). *Id.* The three males received salaries of REDACTED (Chris Ellis), REDACTED (Matt Malovny), and REDACTED (Elbert Rosario). *Id.*

- In September 2018, there were two Document Control Coordinators in the Documents Controls group (part of the Financial Functional group). Robert Remler, the male Document Control Coordinator, was paid REDACTED  *Id.* The female Document Control Coordinator (Samantha Little) received only REDACTED.  *Id.*

16

### 3. Women Hired or Promoted into Roles Previously Held by Men Were Paid Less than the Former Male Occupants of those Positions.

In defining the term "equal work," the EPA's implementing regulations provide that "where an employee of one sex is hired or assigned to a particular job to replace an employee of the opposite sex but receives a lower rate of pay than the person replaced, a prima facie violation of the EPA exists." 29 C.F.R. § 1620.13(b)(2).

Here, there are several of examples of this practice at the JV. As set forth above, when Plaintiff Robertson was promoted to Document Controls Director, she was initially paid REDACTED, which was $45,000 less than her male predecessor, Richard Pomaville. *See supra* at 11-12. Similarly, when Jill Bramwell was hired to fill the Contracts Manager position vacated by Kevin Pfeiffer, she was paid $5,000 less than he had been receiving. *See supra* at 11.

### 4. Defendants Changed Job Titles to Hire Women at Less Senior Positions.

The above project- and group-wide salary analysis demonstrates that women in the JV Coordination groups were disproportionately packed into lower, less well-paid positions. *See supra* at 12-14. As Samantha Little's experience shows, however, the fact that women held less-senior job titles with correspondingly lower salaries does not necessarily mean that their job *duties* were not the same as men who nominally held higher positions within the JV. As discussed above, Samantha Little originally applied and interviewed for a Document Control Manager position at the JV but was offered the lower position of Document Control Coordinator. *See supra* at 10-11. Ms. Robertson, who interviewed Ms. Little as a replacement for Michael Schmack (a male Document Control Manager), believed that she should have been offered the Manager position based on her experience. Buzzard Decl., Ex. 12 (Robertson 11.2019 Dep.) at 63-64, 91:21-92:15. Indeed, according to Ms. Robertson, "[u]p to this day, there is no justification as to why Samantha

Little has the salary she has today in comparison to the salary that Michael Schm[a]ck had when he left." *Id.*, Ex. 11 (Robertson 3.2019 Dep.) at 77:23-78:2. In responding to the email approving the offer to Ms. Little, Ms. Robertson stated "for the record" that "the offer to Samantha is not reflective of the scope of work she will be expected to perform." Buzzard Decl., Ex. 24 (Emails). Ms. Robertson explained that she made this comment because she had "advertised for a document control manager, I interviewed for a document control manager, and it was a bit of a curve ball to me that [Ms. Little] was being considered for coordinator as well as at a lower salary." *Id.*, Ex. 13 at Skanska1754. This evidence – that Defendants' arbitrarily manipulated job titles to pay a woman less than her experience and duties justified – suggests that once this case reaches the merits stage of discovery there may very well be members of the EPA Collective who held lower job titles than the duties they were expected to perform.

## IV.    ARGUMENT

### A.    Legal Standard for Conditional Certification and Court-Authorized Notice

Certification of EPA claims is governed by 29 U.S.C. § 216(b), which also governs certification of a collective under the Fair Labor Standards Act ("FLSA"). 29 U.S.C. §§ 206(d), 216(b); *see Kassman v. KPMG LLP*, No. 11-cv-3743 (LGS), 2014 U.S. Dist. LEXIS 93022, at *12 (S.D.N.Y. July 8, 2014). Section 216(b) provides that a collective action "may be maintained against any employer . . . in any Federal or State court . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Such collective actions are favored under the law because they benefit the judicial system by enabling the "efficient resolution in one proceeding of common issues of law and fact" and provide employees with the opportunity to "lower individual costs to vindicate rights by the pooling of resources." *Hoffman-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989); *Alonso v. Uncle Jack's*

*Steakhouse, Inc.*, 648 F. Supp. 2d 484, 489 (S.D.N.Y. 2009). The act of "certifying" a collective action means only that the Court has "exercise[d] . . . [its] discretionary power . . . to facilitate the sending of notice to potential class members." *Myers v. The Hertz Corp*., 624 F.3d 537, 555 n.10 (2d Cir. 2010), "Because the EPA uses the same enforcement mechanism as the FLSA, an application to send notices to similarly situated individuals is governed by the same body of law." *Knox v. John Varvatos Enters.*, 282 F. Supp. 3d 644, 653 (S.D.N.Y. 2017).

Courts in the Second Circuit engage in a two-step approach when deciding a motion for conditional certification under the EPA. *See Kassman*, 2014 U.S. Dist. LEXIS 93022, at 12-13. "The first step involves the court making an initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).  At the second stage, following the completion of discovery, a court will "determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Id.*

To succeed at the first stage, which is applicable to this motion, the named plaintiffs need only make a "modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Kassman*, 2014 U.S. Dist. LEXIS 93022, at *13 (quotation marks omitted). This burden is "minimal . . . because the determination that the parties are similarly situated is merely a preliminary one and may be modified or reversed at the second stage certification stage." *Barrett v. Forest Labs., Inc.*, No. 12-cv-5224(RA)(MHD), 2015 U.S. Dist. LEXIS 117203, at *5-6 (S.D.N.Y. Sept. 2, 2015) (quotation marks omitted).  Thus, "[a]t this procedural stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Kassman*, 2014 U.S. Dist. LEXIS 93022, at

*14. This is because the focus at the notice stage "is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are similarly situated with respect to their allegations that the law has been violated." *Id.* at *18 (quotation marks and ellipses omitted).

**B.** **Plaintiffs Have Made the Modest Factual Showing Required for Conditional Certification**

Far exceeding a "modest factual showing," Plaintiffs here have submitted extensive evidence that they and putative EPA Collective members were subject to common policies at the JV that violated their rights under the EPA. As discussed above, Plaintiffs have presented evidence that the amount of each Defendant's overall profit from the LaGuardia project depends, in part, on the salary costs of the other Defendants' employees, which will be deducted from the final contract price. *See supra* at 3. Thus, each Defendant has a vested interest in the amount of compensation paid by the other Defendants. As a result, it is no surprise that every aspect of JV project staff compensation – from the initial budgeting to the forecasting of future salary costs to the hiring of and actual compensation paid to every JV project staff member – is subject to a centralized process that requires the approval of the Project Officer (Nilsson) and the Deputy Project Officers (Piscopo and Attardo) at each stage. *See supra* at 7-12.

Defendants will undoubtedly argue that compensation determinations are made solely at the individual company level, and not at the JV project level. But evidence abounds of a centralized process under which the JV project officers have the final say as to compensation of JV project staff. Mr. Silverman testified that the approval of the Project Officer and Deputy Project Officers for the hiring or transfer of employees on the JV was obtained via emails that contained salary information. Buzzard Decl., Ex. 9 (Silverman Dep.) at 183:24-184:1, 196:14-197:18. Examples of these emails show that this approval was sought before any offer was extended. *See* Buzzard Decl., Ex. 13 at Skanksa1754-55, Skanksa96, Skanksa1632-34; *id.*, Ex. 14 at 1736-38. Indeed, with

respect to the hiring of Jill Bramwell, Mr. Piscopo explicitly directed the Walsh human resources employee "to obtain Skanksa approvals *to release this offer letter.*"  Buzzard Decl., Ex. 14 at Walsh1736 (emphasis added).  Moreover, as Ms. Little's circumstances show, when an offer with a specific salary level had been approved by the three project officers, the project officers would again have to approve any subsequent offer that resulted from hiring negotiations and increased the salary beyond the approved level. *See* Buzzard Decl., Ex. 13 at Skanksa1754-55, Skanksa1731, Skanska96. This was so even though the offered position (Document Control Coordinator) remained unchanged. *See id.*

These approval emails are supported by the evidence that: (1) Project Officer Nilsson "approved" a Walsh hiring plan that involved the hiring or transfer of nineteen employees to the JV and detailed their salaries (or expected salary ranges), *see* Buzzard Decl., Ex. 14 at Walsh112; and (2) the staff "approval lists" signed by all three project officers that, although redacted, obviously contain the names and salary information of numerous individuals who had been "approved to work on and bill the [Skanksa Walsh JV] project." *Id.*, Ex. 15 (Approval Lists).

If that were not enough, Plaintiff Navar testified that she was informed prior to receiving her job offer that her "compensation would have to be run through the Joint Venture" and "be approved by the Skanska and the Walsh persons." Buzzard Decl., Ex. 10 (Navar 3.2019 Dep.) at 52:4-16, 52:25-53:11, 53:19-24. Similarly, Plaintiff Robertson, who had first-hand experience with hiring practices at the JV, testified that the "input" of Vince Piscopo of Walsh was "sought as far as the salary was concerned" when she was in the process of interviewing candidates for the Document Controls group. Buzzard Decl., Ex. 11 (Robertson 3.2019 Dep.) at 30:22-31:17. Indeed, with respect to Samantha Little, who was formally employed by Skanksa Building, Ms. Robertson confirmed her understanding that Piscopo of Walsh and Silverman of Skanksa Civil had equal

authority "to make th[e] determination as far as . . . salary was concerned." *Id.* at 78:18-79:2.

Finally, Plaintiffs have presented extensive evidence showing that these centralized compensation policies violated their EPA rights and the rights of numerous other members of the EPA Collective in the same manner. *See supra* at 14-17. As such, Plaintiffs have more than satisfied their burden to make a "modest factual showing that they and potential opt-in plaintiffs together were victims of a common policy or plan that violated the law." *Kassman*, 2014 U.S. Dist. LEXIS 93022, at \*13 (quotation marks omitted).

### C. The Underlying Merits of the Case Are Immaterial to the Determination of Conditional Certification and Notice

Although Plaintiffs have made a robust showing that Defendants violated their rights under the EPA, an in-depth analysis of the underlying merits is unnecessary and inappropriate at this time: "At this early stage, the court does not resolve factual disputes, decide substantive issues going to the ultimate merits, or make credibility determinations." *Gaspar v. Personal Touch Moving, Inc.*, No. 13-cv-8187(AJN), 2014 U.S. Dist. LEXIS 129856, at \*11–12 (Sept. 15, 2014); *Barrett*, 2015 U.S. Dist. LEXIS 117203, at \*12 ("Weighing of the merits is absolutely inappropriate" at the notice stage (quotation marks omitted)). "[T]he question for the Court is not whether there has been an actual violation of law but rather . . . whether the proposed plaintiffs are 'similarly situated' . . . with respect to their *allegations* that the law has been violated." *Davis v. Abercrombie & Fitch Co.*, No. 08 Civ. 1859, 2008 U.S. Dist. LEXIS 86577, at \*30 (S.D.N.Y. Oct 23, 2008) (emphasis in original, quotation marks omitted).

Thus, while Plaintiffs expect that Defendants will dispute, *inter alia*, the job duties and responsibilities of Plaintiffs' male comparators, such disputes should not be considered, much less resolved, at this stage of the proceedings. This is especially so in this case where, under the phased approach, merits discovery has not yet occurred. *See supra* at 1-2.

**D.    The Fact that Plaintiffs May have had Different Job Functions than Some Members of the Putative EPA Collective is Not Material at the Notice Stage**

As this Court recognized in *Kassman*, the proper inquiry at the notice stage is not whether the Named Plaintiffs and other potential members of the collective are similarly situated with respect to their job duties, but rather whether they "are similarly situated *with respect to their allegations that the law has been violated.*" *Kassman*, 2014 U.S. Dist. LEXIS 93022, at *20 (quotation marks omitted, emphasis in original). Indeed, courts "'routinely grant conditional certification of multiple-job title classes'" where, as here, it is shown that a common policy applies equally to all such job titles. *Id.* (quoting *Cunningham v. Elec. Data Sys. Corp.*, 754 F. Supp. 2d 638, 651 (S.D.N.Y. 2010)); *see also Diaz v. S&H Bondi's Dep't Store, Inc.*, No. 10-cv-7676 (PGG), 2012 U.S. Dist. LEXIS 5683, at *18 (S.D.N.Y. Jan. 18, 2012) (citing cases and explaining that "[c]ourts have found employees 'similarly situated' for purposes of the FLSA where they performed different job functions or worked at different locations, as long as they were subject to the same allegedly unlawful policies"); *Wellens v. Daiichi Sankyo, Inc.*, No. 13-cv-581(WHO), 2014 U.S. Dist. LEXIS 70628, at *8, 17-19 (N.D. Cal. May 22, 2014) (conditionally certifying a collective comprised of sixteen different job titles and multiple job tiers).

Here, Plaintiffs have presented extensive evidence that all JV project staff were subject to Defendants' JV-wide compensation determination processes regardless of job title. *See supra* at 7-12. Plaintiffs have also introduced substantial evidence that Defendants' compensation policies affected numerous female JV staff holding different job titles in the same way. *See supra* at 12-17. Moreover, while the duties performed by members of the EPA Collective may differ in some respects from those held by the Named Plaintiffs, all members of the proposed EPA Collective are engaged in providing project-wide "coordination" services to the JV as a whole. *See supra* at 5-6.

There is also evidence that the JV was a fluid environment in which staff regularly shifted

between functional groups, assumed duties that cut across functional groups, and performed duties that were similar to those undertaken by employees of other functional groups. For example, Michelle Martucci, who was an Assistant Environmental Manager in the EHS functional group in October 2017, *see* Buzzard Decl., Ex. 4 at October 2017 Org. Chart, had by September 2018 moved to the position of Design/Build Coordinator in the Design Build Management group, *see id.* at September 2018 Org. Chart. Tiffany Price, a Document Control Manger in the Project Controls group in November 2016, had shifted to the cost team (also within the Project Controls group) and assumed the position of Cost Engineer by March 2017. *Compare id.* at November 2016 Org. Chart, *with id.* at March 2017 Org. Chart. Mike Lofredo was a project engineer originally on the Commercial team who also performed certain functions associated with the Quality functional group and worked for periods of time in both groups. *See* Buzzard Decl., Ex. 16 (Twidwell 12.2019 Dep.) at 52:24-53:21. Carolyn Dorsett, who was officially placed in the Business Management functional group as a project administrator, at times performed functions similar to a procurement specialist (usually located in the Commercial Management functional group) and a document control coordinator (usually located in the Project Controls group). Buzzard Decl., Ex. 9 (Silverman Dep.) at 132:13-20. Such evidence suggests that JV project staff could, and did, fill a variety of roles and provide a number of duties across the JV.

In sum, where, as here, Plaintiffs have shown that they and potential members of the EPA Collective are similarly situated with respect to their allegations that the EPA has been violated, "factual variances that may exist between the plaintiff[s] and the putative class do not defeat conditional class certification." *Kassman*, 2014 U.S. Dist. LEXIS 93022, at *20-21 (quotation marks omitted). Here, Plaintiffs have (1) presented statistical data showing vast pay disparities between men and women on a project-wide level and at the at the specific functional group level,

*see supra* at 12-14; and (2) provided numerous examples of specific individual pay disparities between (a) men and women with the same job duties, *see supra* at 14-15, (b) men and women with the same (or comparable) JV-specific job titles, *see supra* at 15-16, and (c) women and the men who previously held their identical position, *see supra* at 16. In the face of such a robust showing that Plaintiffs and putative members of the collective are similarly-situated with respect to the alleged EPA violations, any "variances" between Plaintiffs and the collective "are more appropriately analyzed during the second—decertification—stage" after merits discovery has been completed. *Kassman*, 2014 U.S. Dist. LEXIS 93022, at 21 (quotation marks omitted).

## V.    CONCLUSION

In light of Plaintiffs' abundant evidence that they and potential members of the EPA Collective together were victims of a centralized, JV-wide policy that violated their rights, the Court should authorize the dissemination of notice to female employees of Defendants who: (1) have been assigned to work at Defendants' Joint Venture at any time since November 12, 2015 (a date three years before the filing of the Complaint in this action);[6] and (2) worked on any of five site-wide "coordination" groups at the Joint Venture – (a) EHS, (b) Quality, (c) Design/Build Management, (d) Commercial Management, or (e) Financial (which contains the sub-groups of Project Controls, Business Management, Project Accounting & Finance).[7]

---

[6] "[B]ecause equitable tolling issues often arise as to individual opt-in plaintiffs, courts frequently permit notice to be keyed to the three-year period prior to the filing of the complaint, with the understanding that challenges to the timeliness of individual plaintiffs' actions will be entertained at a later date." *Gaspar*, 2014 U.S. Dist. LEXIS 129856, at *19. Here, given the time expended on resolving Defendants' unsuccessful motion to sever, there is a strong case for equitable tolling with respect to at least that period.

[7] In addition, the Court should order the parties to meet and confer on the following: (1) the contents of the proposed notice; (2) the distribution methods for the notice; and (3) the discovery of the names, last known addresses, last known phone numbers, last known e-mail addresses, dates of employment, position(s) held, and social security numbers of potential opt-in plaintiffs in order to facilitate distribution of notice. *See, e.g.*, *Barrett*, 2015 U.S. Dist. LEXIS 117203, at *28-29.

Dated: New York, New York
      January 17, 2020

By:    _/s/Lucas C. Buzzard____
        D. Maimon Kirschenbaum
        Lucas C. Buzzard
        JOSEPH & KIRSCHENBAUM LLP
        32 Broadway, Suite 601
        New York, NY 10004
        (212) 688-5640

        *Attorneys for Plaintiff*