**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ALLISON NAVAR AND CAMILLE ROBERTSON, ON BEHALF OF THEMSELVES AND ALL OTHERS SIMILARLY SITUATED,<br><br>                              Plaintiffs,<br><br>              -against-<br><br>WALSH CONSTRUCTION COMPANY II, LLC, SKANSKA USA CIVIL NORTHEAST, INC. AND SKANSKA USA BUILDING, INC.<br><br>                              Defendants. | Index No.  1:18-CV-10476 |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS WALSH CONSTRUCTION COMPANY II LLC, SKANSKA USA CIVIL NORTHEAST, INC. AND SKANSKA USA BUILDING, INC.'S OPPOSITION TO CONDITIONAL CERTIFICATION OF AN EQUAL PAY ACT COLLECTIVE ACTION**

**KELLEY DRYE & WARREN LLP**
101 Park Avenue
New York, New York 10178
Phone: (212) 808-7800
Facsimile: (212) 808-7897
*Attorneys for Defendant*
*Walsh*

**LITTLER MENDELSON, P.C.**
One Newark Center, 8th Floor
Newark, New Jersey 07102
Phone: (973) 848-4700
Facsimile: (973) 643-5626
*Attorneys for Defendants Skanska USA Civil*
*Northeast Inc. & Skanska USA Building Inc.*

# TABLE OF CONTENTS

**Page No.**

SUMMARY OF ARGUMENT ................................................................................. 1

STATEMENT OF FACTS .................................................................................... 3

    A.    Procedural Posture And Plaintiffs' Waiver of Class Certification ....................... 4

    B.    The Proposed Collective Plaintiffs Are Significantly Different from the Plaintiffs and Each Other .................................................................. 4

    C.    Defendants Each Properly and Independently Determine the Salaries of Their Own Employees Without Input from Each Other ....................................... 7

        1.    Walsh, Skanska Building And Skanska Civil Each Operate Independently of One Another ................................................. 8

            a.    Defendants Do Not Seek "Approval" From One Another For The Salary Of A Person Assigned To The LGA Project ........ 8

            b.    The JV Uses Salary Forecasts Based on Already Established Salaries to Project Costs – Not To Set Salaries ........ 11

        2.    Walsh Bases Its Own Compensation Decisions on Legitimate, Non-Discriminatory Factors ..................................................... 12

        3.    The Skanska Defendants Base Their Own Compensation Decisions on Legitimate Factors ............................................................ 13

    D.    There Is No Arguable Collective Of Allegedly Underpaid Women Working On The LGA Project ................................................................... 14

ARGUMENT ............................................................................................ 17

I.    Plaintiffs have Forfeited their class action claims under new york STATE and new york CITY laws ................................................................ 17

II.    Legal standard for conditional certification UNDER THE FEDERAL EPA ................ 17

III.    members of plaintiffs' proposed epa collective are not similarly situated to plaintiffs or each other ........................................................... 19

    A.    Plaintiffs Fail to Allege that They Are Similarly Situated With Respect to Their Allegations That the Law Has Been Violated ............................... 19

    B.    Navar, Robertson, and the Members of the Proposed EPA Collective Had Dramatically Different Job Titles, Duties, and Responsibilities, and Thus They Are Not "Similarly Situated." ............................................... 20

    C.    Defendants Do Not Have a Common Policy or Plan that Violates the Law ....... 23

IV.    PLAINTIFFS ARE NOT ENTITLED TO EQUITABLE TOLLING ............................... 24

CONCLUSION ......................................................................................... 25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Baldwin Cty. Welcome Ctr. v. Brown*,
    466 U.S. 147 (1984).............................................................................................25

*Barfield v. New York City Health & Hosps. Corp.*,
    No. 05 Civ. 6319(JSR), 2005 WL 3098730 (S.D.N.Y. Nov. 18, 2005) ...........................20, 24

*Brickey v. Dolgencorp., Inc.*,
    272 F.R.D. 344 (W.D.N.Y. 2011)..........................................................................24

*Conte v. Emmons*,
    895 F.3d 168 (2d Cir. 2018)................................................................................17

*Eng-Hatcher v. Sprint-Nextel Corp.*,
    No. 07 Civ. 7350(BSJ), 2009 WL 7311383 (S.D.N.Y. Nov. 13, 2009) ...........................20, 24

*Fu v. Mee May Corp.*,
    No 15. Civ. 4549(KPF), 2016 WL 1588132 (S.D.N.Y. Apr. 20, 2016).................................18

*Garcia v. Spectrum of Creations Inc.*,
    102 F. Supp. 3d 541 (S.D.N.Y. May 4, 2015) ........................................................21

*Irwin v. Dep't of Veterans Affairs*,
    498 U.S. 89 (1990).............................................................................................25

*Jimenez v. Lakeside Pic-N-Pac, L.L.C.*,
    2007 WL 4454295 (W.D. Mich. Dec. 14, 2007) ....................................................19

*Johnson v. Academy Mortg. Co.*,
    No. 2:12-cv-276-TS, 2012 WL 3886098 (D. Utah Sept. 6, 2012) .........................................25

*Kassman v. KPMG LLP*,
    No. 11 Civ. 03743(LGS), 2014 WL 3298884 (S.D.N.Y. July 8, 2014) .....................19, 22, 23

*Kassman v. KPMG LLP*,
    No. 11 Civ. 03743(LGS), 2015 WL 5178400 (S.D.N.Y. Sept. 4, 2015)................................25

*Kassman v. KPMG LLP*,
    No. 11 Civ. 3743(LSG), 2018 WL 6264835 (S.D.N.Y. November 30, 2018)............18, 22, 23

*Khan v. Airport Mgmt. Servs., LLC*,
    No. 10 Civ. 7734(NRB), 2011 WL 5597371 (S.D.N.Y. Nov. 16, 2011) ...............................18

*Korenblum v. Citigroup, Inc.*,
    195 F. Supp. 3d 475 (S.D.N.Y. 2016).....................................................................19

*Mata v. Foodbridge LLC*,
No. 14 Civ. 8754(ER), 2015 WL 3457293 (S.D.N.Y. June 1, 2015) .....................................21

*Morales v. Plantworks, Inc.*,
2006 WL 278154 (S.D.N.Y. Feb. 1, 2006) ..........................................................................23

*Myers v. Hertz Corp.*,
624 F.3d 537 (2d Cir. 2010) .................................................................................................18

*Romero v. H.B. Auto. Grp., Inc.*,
No. 11 Civ. 386(CM), 2012 WL 1514810 (S.D.N.Y. May 1, 2012) .....................................21

*Young v. Cooper Cameron Corp.*,
229 F.R.D. 50 (S.D.N.Y. 2005) .............................................................................................19

**Statutes**

29 U.S.C. §206(d) ......................................................................................................... *passim*

29 U.S.C. §256 ...................................................................................................................25

29 U.S.C. §201 .............................................................................................................18, 25

New York City Human Rights Law ....................................................................................17

New York State Equal Pay Act ...........................................................................................17

**Other Authorities**

Fed. R. Civ. Pro. 23(a) .......................................................................................................17

Federal Rule of Civil Procedure 23 ....................................................................................17

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**Allison Navar and Camille Robertson, on behalf of themselves and others similarly situated,**
                                    **Plaintiffs,**
                    -against-
**Walsh Construction Company II, LLC, Skanska USA Civil Northeast, Inc. and Skanska USA Building, Inc.,**

                                    **Defendants.**

---

**Index No. 1:18-CV-10476**

**DEFENDANTS WALSH CONSTRUCTION COMPANY II, LLC, SKANSKA USA CIVIL NORTHEAST, INC. AND SKANSKA USA BUILDING, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION OF AN EQUAL PAY ACT COLLECTIVE ACTION**

## SUMMARY OF ARGUMENT

More than a year after the commencement of this purported collective action under the Equal Pay Act ("EPA"),[1] with thousands of pages of documents exchanged, hours of testimony in eight depositions, and extensive briefing, Plaintiffs have been unable to find a single scrap of concrete evidence to support the central reason they say this Court should certify a collective: that "Plaintiffs and other female employees working at Defendants' Joint Venture ("JV") for the redevelopment of LaGuardia Airport are all subject to a centralized set of compensation processes subject to the approval of the JV project and deputy project officers." (Pl. Brief at 1.)

Indeed, in their *own* depositions, Plaintiffs Camille Robertson and Allison Navar unequivocally testified that they know *nothing about* the salaries of other women and men on the JV project, the criteria that individual employers use to determine salary, and how the salary determinations were even made. What is equally unequivocal is the unrefuted testimony of the corporate witnesses in this case: namely, that individual supervisors working for Defendants Walsh Construction Company ("Walsh"), Skanska USA Building, Inc. ("Skanska Building"),

---

[1] In their Motion, Plaintiffs have abandoned any attempt to seek Class certification, apparently recognizing the facts do not support Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequate representation.

and Skanska USA Civil Northeast, Inc. ("Skanska Civil") (collectively, "Defendants")[2] make individualized salary decisions at the ground level for individual employees on a case-by-case basis. Against that unrefuted background, Plaintiff's contention that "female employees working at Defendants' Joint Venture ("JV") for the redevelopment of LaGuardia airport are all subject to a centralized set of compensation processes" (*id.*) is exposed for the wishful thinking that it is.

Defendants are members of a JV whose sole purpose is to rebuild LaGuardia Airport (the "LGA project"). The project is of such a massive scale that no one company could contribute all the resources necessary to complete the project—materials, equipment, and personnel. Therefore, each JV partner loans or assigns ***its own employees*** to work on the LGA project depending on several different factors, including the specialization, skill, background, education, and expertise of the employee, and the needs of the specific responsibilities the respective partners in the JV must fulfill. Many of these employees assigned to the JV are long-term Skanska Building, Skanska Civil, or Walsh employees removed or transferred from other projects to work on the LGA project. While others are newly hired, they are hired by Walsh and the Skanska entities as their own employees, whose respective employment will continue with those separate companies after the LGA project is complete. As both Walsh and the Skanska entities testified, it is not the case—indeed, it would be bizarre—that Walsh could tell the Skanska entities who to hire or fire, or how to pay them, and vice versa.

Just as these employees are hired and controlled separately by their respective employers, their compensation is also determined by the companies separately, and not pursuant to some fictional "top down" JV process the Plaintiffs describe but cannot support with evidence. Employees' salaries are highly discretionary and determined by individual Walsh managers, or Skanska managers, based on qualifications and market rate of a specific position. Critically,

---

[2] Skanska Civil together with Skanska Building are referred to herein as the "Skanska Defendants."

salary decisions are made on a case-by-case basis by individual managers who then seek approval within their own companies. Because the JV partners must control project costs together (including materials, equipment, and labor costs), they communicate about all those costs for informational purposes. Plaintiffs seize on evidence of inter-company communication about compensation and claim it constitutes evidence of joint, top-down authority over salaries. But the evidence clearly shows it is not that. To the contrary, the evidence shows that the respective Defendants do not "approve" or become involved with the salary recommendations for employees, and that the process of determining salaries even within the individual companies is a "bottom-up" decision-making process made first by the individual supervisors hiring within their own small groups, who then seek approval up the chain for salary decisions they have already effectively made. And certainly, the companies contributing to the JV have never had *any* shared policies regarding employee pay, let alone discriminatory ones.

To certify a collective, this Court must find in the record, as Plaintiffs allege, that Defendants have a common policy or practice of paying female employees on the LGA project less than their male counterparts and/or denying them promotional opportunities or similar job titles for similar work. However, the facts simply do not support these collective claims at all: Plaintiffs 1) are not similarly situated to each other, let alone to the potential plaintiffs they seek to represent; and 2) fail to identify any common policy or plan to which this un-certifiable collective was supposedly subjected. As such, Plaintiffs' Motion must be denied.

## **STATEMENT OF FACTS**

The record evidence on "class/collective certification" affirmatively demonstrates that there is no collective of "similarly situated" employees, and indeed, that Plaintiffs themselves could not even allege knowledge of the salaries and working conditions of other women, the lack of a policy or plan that governs determinations of each Defendant's employees, and the variance

of the job duties among Plaintiffs and the potential opt-ins.

### A.   Procedural Posture And Plaintiffs' Waiver of Class Certification

Plaintiffs filed this lawsuit in November 2018, seeking to bring a collective action under the Federal Equal Pay Act, as well as class actions under New York City and State laws. (*See* Compl. ECF No. 1, ¶¶ 25, 29, 41.) The parties first engaged in discovery limited to the issue of whether Defendants could be considered joint employers of the Plaintiffs. (ECF Nos. 29, 34.) In August 2019, the Court issued a scheduling order directing the parties to conduct "limited discovery related to class/collective certification," with merits-based discovery to follow. (ECF No. 63.) Since then, the parties have engaged in and completed extensive discovery on the class/collective issues. Plaintiffs have now filed their motion for "class/collective certification," and do not address the New York City or State laws in any fashion. Nor do Plaintiffs address any of the requirements for class as opposed to collective certification. They focus solely on an EPA collective, which is addressed herein.

### B.   The Proposed Collective Plaintiffs Are Significantly Different from the Plaintiffs and Each Other.

Plaintiffs' modified definition of their proposed EPA Collective includes only "female employees of any Defendant who . . . worked on any of five site-wide 'coordination' groups at the JV . . . ." (Pl.'s Mem. 2.) Plaintiffs claim that their proposed collective consists of about 65 women working at the LGA project. (*Id.*) Plaintiffs have obtained extensive discovery on the job duties of particular employees in their purported collective. (*See generally* Konkel Decl., Ex. A,[3] Silverman Dep. at 25:25-24:22; *contra* Pl.'s Mem. 16.)

---

[3] All references to "Ex. ___" are to the exhibits annexed to the Declaration of Mark A. Konkel, Esq. in Support of Defendant's Memorandum of Law in Opposition to Plaintiffs' Motion for Collective Certification. True and correct copies of excerpts of the deposition transcripts of Scott Silverman ("Silverman Dep."), Jeff Twidwell ("Twidwell Dep."), Plaintiff Allison Navar ("Navar Dep."), and Plaintiff Camille Robertson ("Rob. Dep."), and certain deposition exhibits, are annexed to the Konkel Declaration.

Workers at the JV are broadly categorized as either being in an "operational" group, who "have direct responsibility for the construction work in place," or in a "coordination" group, who "support the operations team." (Silverman Dep. at 17:10-15.) As Plaintiffs recognize, "coordination" workers include people in a wide variety of groups, from Environmental, Health & Safety, to Financial support, to Quality controls. (Pl.'s Mem. 2 (identifying the five coordination groups as "(a) Environmental, Health & Safety, (b) Quality, (c) Design/Build Management, (d) Commercial Management, [and] (e) Financial [and its sub-groups].").)

Job titles for JV purposes—which were not the same as job titles from the assigning employer—are an extremely poor indicator of similarity between jobs: the same or similar titles, used to keep track of personnel on the JV, involved widely varying responsibilities that changed and evolved over time, and employees had more than none title. Initially, employees of Defendants were given a job title for the JV that "represents the specific assignments and responsibilities that are associated just with the Joint Venture," not their positions before or after the LGA project is complete. (Silverman Dep. at 84:17-20.) Those employees therefore often had entirely different job titles at their own employer than the titles assigned to them while they work at the Joint Venture. (*Id.* 84:21-85:2.)

Since November 2016, there have been at least 50 different job titles assigned to people working across the five different JV coordination groups, and that number has grown over time. (Buzzard Decl., Ex. 5.) The JV is a "large and complex" project, so many roles are specialized and unique from one another. (Silverman Dep. at 164:9-11.) Even when employees had the same job titles, they often had different responsibilities, as both Plaintiffs admit. Navar was a Project Engineer, but she acknowledged that other project engineers, such as Mike Tyler, Jackson Honis, and Milad Moradi, had the same title, but did not perform the same job functions because she worked primarily in the legal department. (Ex. B, Navar Dep. at 218:23-219:10.) With respect to

5

other coordination groups, Navar could not identify any males who worked in project controls, project accounting, business management, design or EHS with job duties similar to hers. (*Id.* at 231:16-20; 232:24-233:2; 233:11-17; 236:16-21; 237:1-8.)

Similarly, Robertson was a Document Control Manager[4] and testified that she had "different job duties" from each of the other Document Control Managers working at the JV. (Ex. C, Robertson Dep. at 38:15-43:18 (admitting that at least five other Document Control Managers all had "different job duties," and identifying those varied duties)). Even after Robertson was promoted to Document Control Director, her duties differed from Robert Pomaville, the individual who preceded her in that role, because Robertson was not hired to bring in the "additional analytics and processes" from work in other industries and "did not have the background necessary to do those functions." (Silverman Dep. at 221:12-222:9.) Robertson's responsibilities were reduced to fit her background and experience. (*Id.* at 222:9-14.)

The financial director of the JV, Scott Silverman, likewise noted that a project job title "doesn't necessarily strictly limit what that person could do. There could be people with the same title that are doing different functions." (*Id.* at 89:24-90:2.) Some project job titles are "more specific, some titles are less specific." (*Id.* 89:13-14.) Project job titles were intended only to generally communicate the type of work that an employee is doing at the JV, and will not necessarily reflect other tasks that the person receives from his or her own employer (Walsh or either of the Skanska Defendants). (*Id.* at 64:13-19, 84:17-85:2, 95:17-96:3.) For example, both Manjit Kaur and Melissa Szesnat had "senior project accounting titles but they have different functions." (*Id.* at 90:4-10.)

A number of employees even held the same titles at different points in time and were

---

[4] Robertson joined Skanska Building as a Document Control Manager assigned to work at the JV, and Skanska Building later assigned her to the role of Document Control Director.

especially likely to have different responsibilities from other employees. Moreover, as the LGA project has progressed, the duties associated with various titles changed with the project's evolving needs. (*See, e.g.*, Silverman Dep. at 96:7-24 (noting that the role of a "cost engineer" changed over time from a "cost forecast role" to one of a "system support role"); *see also id.* at 82:11-13 ("The roles of the cost manager has changed over the course of the project.").) In addition, significant differences existed between roles even where there were only slight variations in titles. For example, a "design build manager" at the JV coordinated "building areas with the designer" for the project as a whole, while a "design build coordinator" was responsible for "design management coordination [for] just certain areas and the designer as opposed to the buildings as a whole." (Silverman Dep. at 68:10-69:11; *see also id.* at 143:20-144:12 (describing the differences between a "document control administrator" and a "document controller").)

Nor was there even a routine similarity among the title between the coordination groups. (*Contra* Pl.'s Mem. 23-24.) For example, Tiffany Price was at one time a Document Control Manager who later became a Cost Engineer (*see id.*) and with that change, "[s]he took responsibilities for . . . managing one of the areas, cost reporting." (Silverman Dep. at 74:11-16.)

Accordingly, because the job titles, duties, responsibilities, and work varies widely among individuals employees in the "coordination" groups at the JV, there are no routine similarities among the Plaintiffs and other alleged collective members on the basis of JV "title."

### C.  Defendants Each Properly and Independently Determine the Salaries of Their Own Employees Without Input from Each Other.

Defendants maintain their own policies on hiring, firing, disciplining, assigning, compensating, and supervising employees independently, without input from each other. (Ex. D, Twidwell Dep. at 24:12-15; 47:25-48:7; 154:5-9; 176:5-22; 177:14-22; 185:8-18; Ex. E, Twidwell Dep. at 81:22-83:22.) Apparently recognizing that the potential members of the EPA Collective are not in similar roles with one another, Plaintiffs instead attempt to fill in this gap by

theorizing, or in essence concocting, an alleged "common policy or plan" with regard to salary (Pl.'s Mem. 1). This is critical: ***there is <u>no</u> JV common policy or plan related to employee pay***, discriminatory or not.[5]

> ### 1.    Walsh, Skanska Building And Skanska Civil Each Operate Independently of One Another.

Walsh decides what it will pay the employees it assigns to work at the JV without input from the Skanska Defendants, and the Skanska Defendants each do so without input from Walsh. (Ex. D, Twidwell Dep. at 153:12-154:9; 176:21-177:8.) Plaintiffs speculate without any factual basis that Defendants have a joint compensation "policy" because Walsh and the Skanska Defendants notify each other of their hiring decisions, and because the JV forecasts its costs, which include salaries. (Pl.'s Mem. 7-12.) However, there is literally ***no*** record evidence of any common compensation policy applicable to either Plaintiff or the proposed collective.

> ### a.    Defendants Do Not Seek "Approval" From One Another For The *Salary* Of A Person Assigned To The LGA Project.

Plaintiffs first speculate that Defendants had input into each other's compensation decisions because they purportedly "approved" each other's hiring decisions. (Pl.'s Mem. 8-9.) The clear evidence shows that Plaintiffs' pure speculation is simply false.

Defendants do not seek approval from one another for a person's salary—they determine employee salaries independently and without consultation from one another regarding the specific salary amount. (Ex. D, Twidwell Dep. at 119:22-25; 153:12-154:9; 176:21-177:8.) At the same time, they do share project cost information with one another because they must together control the overall JV budget. (Silverman Dep. 197:21-23; Ex D, Twidwell Dep. 91:8-92:4; 113:15-20; Ex. E, Twidwell Dep. 78:14-17.) Walsh, for example, has its own independent

---

[5] Both Walsh and the Skanska Defendants make their compensation determinations based on legitimate factors such as employees' education and experience, market rates, and their own budgets. (Ex. D, Twidwell Dep. 153:15-24.)

cost department that continually updates the forecasts of costs for the JV project, which includes "direct work, subcontractor claims and change orders," "management costs," and costs related to "general conditions." (Ex. D, Twidwell Dep. at 32:11-20.) Walsh's cost department also keeps track of personnel costs. The point of keeping track of all costs, including salaries, is not to set salaries, but to accurately track what each Defendant needs for the JV and "to be prudent in how money is spent." (Ex. D, Twidwell Dep. at 34:20-25.) Determining costs in general involves input and communication from and between a variety of people across the LGA project. (*Id*.).

When Defendants notify each other that they are filling an open position, they often include salary information for the assignment "as a courtesy to the [JV] partners mainly just to keep the partners informed." (Silverman Dep. at 197:19-23; Ex. E, Twidwell at 78:14-17.) The JV's financial director could not recall *a single instance* when salary was discussed as a component of filling an open role or when a Skanska Defendant took issue with the proposed salary to be paid to a Walsh employee. (Silverman Dep. at 199:19-200:6, 200:24-201:3; 210:8-15.) Similarly, Walsh's Rule 30(b)(6) witness, Jeff Twidwell, testified that when officers talked about "approval" of a new hire they "*never* would have discussed salary." (Ex. D, Twidwell Dep. at 113:7-14.) (emphasis added). Instead, "[t]he conversation is about finding the right person for the role." (Silverman Dep. at 201:2-3.) The purpose is to let the other Defendant know 1) an entity is going to hire a person for a role; 2) the person met with the people on the job that are going to work with this individual and it's a fit; and 3) the cost of the hire. (Ex. D, Twidwell Dep. at 113:15-20.) The JV's officers and deputy officers "cannot dictate what another company would pay its employees." (Silverman Dep. at 201:24-202:2; *see also* Ex. D, Twidwell Dep. at 176:21-177:8 (Walsh managers never make salary decisions for the Skanska Defendants' and vice versa)).

While working at the LGA project, Navar never saw a single document or email that

indicated either Skanska Defendant's executives had a role in setting compensation for Walsh employees, or vice versa. (Navar Dep. at 192:19-193:11.) Navar was never a party to salary conversations or emails, and she admitted that she has no direct knowledge of whether Walsh or the Skanska Defendant executives had any input into salaries of individuals hired by any other Defendant. (Navar Dep. at 196:1-13.) Importantly, Navar does not know whether anyone at the JV had any role in approving her compensation when she was hired (Navar Dep. at 204:8-12.) In reality, neither the Project Officer (Walsh employee) nor the Deputy Project Officers (one from Walsh and one from Skanska Civil) decided Navar's salary. (Ex. D, Twidwell Dep. at 176:5-10.) Navar also testified she did not know of anyone who received a paycheck from the JV versus from his or her own employing entity. (Navar Dep. at 204:8-12, 206:10-14.)

Similarly, Robertson testified that Walsh's Vince Piscopo helped with posting job descriptions and was part of "some of the interviews," but admitted she did not know whether he set the salary for anyone in the document control department. (Robertson Dep. at 157:22-158:10.) In reality, Brian Tighe—Skanska Building's national director of project analytics—made a proposal for Robertson's salary and bonus (which makes sense since Robertson was undisputedly a Skanska Building employee). (Silverman Dep. at 180:7-10.)

The reason Plaintiffs cannot point to any actual evidence of co-Defendant input on, let alone control over, employee compensation is obvious: there is none. Documents in which Defendants seek or give "approval" for the hiring of employees from the other Defendants are clearly related to monitoring costs and staffing, not making joint salary decisions under some alleged common compensation policy. (Silverman Dep. at 182:15-20; 183:14-23.) As partners to a JV, the Defendants need to keep each other apprised of filling roles so that they do not, for example, attempt to assign two people to the same position. (Silverman Dep. at 183:14-23.) As a result, when they are preparing to fill a position at the project, the JV Agreement requires

Defendants to inform one another that they will be filling the open role. (Pl.'s Ex. 1 at Ex. E n.7; *see also* Silverman Dep. at 183:14-23; Pl.'s Exs. 3, 13-15.)

Most importantly, salary decisions are generally made from the "ground up" in the individual Defendants themselves, not pursuant to some "top down" process in the JV. Walsh's corporate witness consistently testified that he "set the salary" and "made a recommendation to . . . the higher-ups within the Walsh organization." (Ex. D, Twidwell Dep. 175:18-23.) The practice of "individual managers making recommendations" and sending that recommendation "up the chain" is consistent "across the company." (*Id.* at 176:11-20.) Accordingly, whether the frame of reference is the whole JV or any individual Defendant, there is simply no support for the idea that a single compensation "policy" could have injured everyone in a purported collective, since salary decisions were highly individualized in the small groups in which each employee worked.

> **b.**      **The JV Uses Salary Forecasts Based on Already Established Salaries to Project Costs – Not To Set Salaries.**

The JV also maintains salary "forecasts," which project the expected costs to the JV for salaries set by the respective JV partners (Silverman Dep. at 47:8-18; Ex. D, Twidwell Dep. at 27:2-28:3). As a flexible budgeting tool, forecasts constantly change. (Ex. D, Twidwell Dep. at 28:4-9.) Critically, salary forecasts are a way of predicting *overall* costs, not making any specific individual salary decision, ever: Defendants "look at the individual employees that have been assigned to the various position codes, we use their current compensation to forecast out what we think the expected cost for the project would be based on the durations that are associated with the position codes and use that to formulate the overall staff forecast." (Silverman Dep. at 42:5-14; *see also* Ex. D, Twidwell Dep. at 178:2-7 (salary forecasts not used to make decisions about individual employees' salaries—they are used for cost forecasting only)). Likewise, position codes used in salary forecasting are not used to establish employees' salaries. (*Id.* at 177:19-22.)

Further, no one at Walsh needs to approve the salaries of any individual employee of the Skanska Defendants for purposes of forecasting, and no one from the Skanska Defendants needs to approve salaries of individual employees of Walsh. (Ex. D, Twidwell Dep. at 113:13-14; Silverman Dep. at 201:24-201:2.) If, however, there is a variance in the *aggregate* salary forecast from the initial budget, that *overall* variance needs to be approved by officers of the JV. (Silverman Dep. at 47:19-48:1.) That could happen, of course, through multiple mechanisms. Defendants might assign more people than expected to the LGA project, offer higher salaries than budgeted, or increase an individual's tenure on the project, any of which would increase a salary forecast. The fact that the officers of the JV must approve variances from a budget does not show that they had input in *setting* any compensation policies of a JV partner who is expected to continue to employ that person even after the LGA project and the JV end. (*Contra* Pl.'s Mem. 8, 20.)

### 2.    Walsh Bases Its Own Compensation Decisions on Legitimate, Non-Discriminatory Factors.

The JV does not have any "common policy or plan" with regard to salary setting, and the pay policies and practices Walsh uses are lawful.[6] While it is premature at this stage to address the merits (though Plaintiffs attempt to), it is worth noting that all discovery to date only underscores that Walsh's practices are non-discriminatory. Navar claims as purported evidence of discrimination that she was paid a starting salary of REDACTED while a male, Kevin Pfeiffer, was paid REDACTED for performing the same job. (Pl.'s Mem. 15.) In reality, she was paid less for performing less complex tasks. (Ex. D, Twidwell Dep. at 189:13-190:6), and Navar herself

---

[6] Walsh considers the "experience and qualifications and general market rate of what that kind of position goes for" when determining an appropriate salary. (Ex. D, Twidwell Dep. at 153:12-24.) Managers at the project level make these assessments, in coordination with a compensation department, and they make salary recommendations to Walsh executives. (*Id.* at 153:12-24; 176:11-20.) Walsh does not take an employee's sex into consideration when setting compensation. (*Id.*)

admitted that Pfeiffer played a more senior role than her. (Navar Dep. at 219:12-15.) And because Navar also readily admitted that she does not know "anyone's specific compensation" or what any other individuals in her group were paid (*id.* at 222:3-9; 322:21-22), she cannot possibly claim that she or anyone else was not paid fairly.

Moreover, Walsh followed its ordinary policy in setting Navar's compensation. When Navar applied for a role as a claims project engineer, she listed her salary expectation as REDACTED to REDACTED. (Navar Dep. at 200:15-19.) Walsh's Jeff Twidwell, her direct supervisor, recommended that Navar earn a salary of REDACTED to his superiors at Walsh. (Ex. D, Twidwell Dep. at 175:15-23.) Walsh was offering Navar an "entry-level position in that role," as generally, project engineers have a "construction management or engineering background; Allison didn't." (*Id.* at 167:19-23; 168:8-17.)

### 3. The Skanska Defendants Base Their Own Compensation Decisions on Legitimate Factors.

The pay policies and practices of the Skanska Defendants are also lawful.[7] Skanska does not take an employee's sex into consideration when it determines their compensation. (Declaration of Scott Silverman at ¶ 7, hereinafter "Silverman Decl.".)  Robertson could only identify two female employees of the Skanska Defendants who she *thought* were unfairly paid less than male employees. (Robertson Dep. at 94:10-16, 95:19-23) (emphasis added).[8] When pressed, however, Robertson admitted that she did not know either of their salaries or their

---

[7] When determining what compensation they will provide to an employee, the Skanska Defendants consider their budgets, market rates, and the candidate's skills and prior experience, among other things. (*See, e.g.*, Silverman Dep. at 174:13-175:20 (describing the duties and prior experience of Robertson's predecessor); Silverman Decl. at ¶ 7.) As Robertson conceded, an employer may legitimately pay people differently based on their education and experience. (Robertson Dep. at 130:8-23.)

[8] Robertson also claimed that a Skanska Building employee named Samantha Little should have been paid more, but then admitted that for her role as a document control coordinator, she was paid appropriately. (Robertson Dep. 93:5-94:9.) Moreover, while Robertson believes Little should have been hired into a more senior role, she acknowledges that every other document control manager – including herself – had years more experience in such a role than Little. (*Id.* at 57:13-15, 67:6-12, 70:23-71:4.)

qualifications. (Robertson Dep. at 94:12-95:15, 96:12-16, 103:7-15.) In fact, one of the employees, Agnes Mendalka, made almost *three times* as much as the male counterpart she was complaining about. (Pl.'s Ex. 5 (comparing salaries of Mendalka and Hunter McKane.) It is unsurprising that Robertson's information is mistaken, as it is based only on "rumors," "secondhand information" and people "complain[ing] in passing." (Robertson Dep. at 108:7-15.)

Further, Robertson's own compensation was determined fairly based on her qualifications. Robertson had approximately two years of experience in document control, and requested a starting salary of REDACTED. (Exs. F and G.) Skanska Building offered Robertson a starting salary of REDACTED, plus incentives, which was increased to REDACTED during her tenure as a Document Control Director. (Pl.'s Mem. 9-10.)[9]

### D. There Is No Arguable Collective Of Allegedly Underpaid Women Working On The LGA Project.

Contrary to Plaintiffs' arguments, women who work at the JV are paid equal to their male counterparts for doing similar work. No statistical or other evidence shows otherwise.

First, Plaintiffs claim that the average women's salary was less than men's salary in the five coordination groups. (Pl.'s Mem. 13-14.) Plaintiffs fail to explain how they are "averaging" salaries, or how they arrived at the numbers they claim demonstrate pay discrimination among genders. This informal math ignores a multiplicity of factors and is simply not the kind of "statistical" evidence that could ever support a collective pay disparity claim. Plaintiffs create a

---

[9] Robertson argues that she should have made the same amount as her predecessor in the Document Control Director role, Richard Pomaville, also a Skanska Building employee. (Pl.'s Mem. 17.) Robertson ignores, however, that she was not truly replacing Pomaville, as that was a role that had changed over time. When Skanska Building hired Pomaville early in the project, it was optimistic based on his experience that he would be able to "introduce analytics and tools to the document control function that are over and above what we would normally do on a project. In addition to that, [his] duties included overseeing the document control department and the document control managers." (Silverman Dep. at 221:12-23.) (In contrast, when Robertson moved "into that role, we determined it was too late in the process to go and to continue looking for those additional functions. And Ms. Robertson did not have the background that would have been necessary to introduce those functions . . . ." (*Id.* at 222:2-9.)

broad "average" across a huge swath of jobs without any consideration whatsoever (let alone analysis) of the duties that those workers are performing, their years of service with Defendants, their prior experience, market rate, or discretionary factors used by individual managers at the separate Defendants who separately determine their respective employees' compensation.

Second, when comparing individuals with the same JV job titles—as dubious as a JV title is for knowing someone's actual role (*see supra* pp. 5-7), it becomes clear that women earned the same *or more* than men. Robertson, for example, was given the title of "Document Control Manager" on the JV Project in November 2016, with a salary of REDACTED. Her male counterparts at the time—Michael Schmack and Kenny Lucien, both made REDACTED as well. Notably, Colleen Murray—a female and Document Control Manager, surpassed all men with that same title, earning REDACTED, thus undercutting Plaintiffs' claim that women in similar roles were paid less than their alleged male counterparts.[10]

The record contains many other instances of women earning the same or more than men for similar work. Lillian Meyer, a Skanksa employee who had the title of "Cost Engineer" on the LGA project, earned REDACTED in November 2016. (Buzzard Decl., Ex. 5, p. 1.) Her three male counterparts, also all employed by Skanska with the title of "Cost Engineer" on the LGA project, made *significantly less* that same month—T. Soubra (REDACTED), Tien Tran (REDACTED), and Mical Jezowski (REDACTED). (*Id.*)

Third, Plaintiffs are cherry-picking alleged disparities across different employers, groups, functions, managers, locations, jobs, skill sets, and credentials without showing how they fit within any group or sub-group that is supposedly similarly situated. Indeed, this cherry-picking

---

[10] As discussed, Robertson points to Skanska Building employee Richard Pomaville, Document Control Director until Robertson assumed the role, as a comparator—but when Robertson was promoted, her job duties were different from Mr. Pomaville's when he was in the same position. Indeed, Robertson's responsibilities were reduced to fit her specific background and experience. (Silverman Dep. at 221:12-221:14.)

underscores the very fact that no one in the purported collective is actually "similarly situated" to one another. For example, Plaintiffs compare Jill Bramwell, who started at Walsh in January 2018 as a Contract Manager, with a salary of REDACTED. (Buzzard Decl., Ex. 3), with Kevin Pfeiffer, another Walsh employee. Mr. Pfeiffer, whose employment was terminated in January 2018, ended with a salary of REDACTED. However, Plaintiffs neglect to include the history of the salaries on the Walsh salary chart, which show that Mr. Pfeiffer had been employed by Walsh since July 2016 and began with a salary of REDACTED His salary increased in March 2017, almost after a full year of work, and did not increase again. Additionally, and importantly, on the LGA Project specifically, Ms. Bramwell's job function was different than Mr. Pfeiffer's, as she was a "Contract Manager" and he was a "Counsel Contracts/Change Order Management".

Navar, hired by Walsh and assigned on the LGA project as a "Change Management Engineer" in March 2017, also claims she was similarly situated to Kevin Pfeiffer, but this is completely unsupported by the record. According to the person who hired Navar, Mr. Pfeiffer was responsible for more complex issues and oversaw the strategy on how Walsh was responding to issues, whereas Navar was only assisting in some of those elements. (Ex. D, Twidwell Dep. at 189:13-190:6.) Further, Navar and Mr. Pfeiffer's caliber of educational backgrounds were significantly different. (Navar Dep. at 202:17-25: 203:1-3; Ex. H.) When she was hired by Walsh, Navar was given the role of claims project group in an entry-level position in that role. (Ex. D, Twidwell Dep. at 167:19-23; 168:8-17.) Generally project engineers have a construction management or engineering background, but Navar lacked either. (Ex. D, Twidwell Dep. at 167:19-23; 168:8-17.) Nor did Navar perform the same job functions as other project engineers. (Navar Dep. at 219:6-10.)

<u>**ARGUMENT**</u>

## I.   PLAINTIFFS HAVE FORFEITED THEIR CLASS ACTION CLAIMS UNDER NEW YORK STATE AND NEW YORK CITY LAWS.

The Court should summarily dismiss Plaintiffs' class action claims under the New York State Equal Pay Act and the New York City Human Rights Law. In their complaint, Plaintiffs alleged that they were entitled to bring class actions against Defendants under Federal Rule of Civil Procedure 23 for violations of those two laws. (Compl. 29, 41.) The Court ordered Plaintiffs to submit their "motion for class/collective certification by January 17, 2020." (ECF No. 83.) Plaintiffs have now filed that motion, and have not sought to certify a class under Rule 23. Instead, they focus solely on whether the Court should certify a collective action under the Federal Equal Pay Act ("EPA"). (Pl.'s Mem. 2 (Plaintiffs seek conditional certification of an EPA Collective . . . .").) Nowhere in their motion do Plaintiffs even attempt to address Rule 23's requirements of numerosity, commonality, typicality, and adequate representation. Fed. R. Civ. Pro. 23(a). Because Plaintiffs were required to file their motion for class certification by January 17, 2020, and failed to do so, the Court should recognize that Plaintiffs forfeited the right to bring those State and City claims on a classwide basis and dismiss all class-related allegations pertaining to such claims. *See, e.g.*, *Conte v. Emmons*, 895 F.3d 168, 176 n.1 (2d Cir. 2018) ("forfeiture is the failure to make the timely assertion of a right").

## II.   LEGAL STANDARD FOR CONDITIONAL CERTIFICATION UNDER THE FEDERAL EPA

The EPA prohibits an employer from paying wages "at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires *equal skill, effort, and responsibility*, and which are performed under similar working conditions . . . ." 29 U.S.C. §206(d)(1) (emphasis added). In EPA collective actions, Courts ordinarily determine whether they will allow issuance of notices to

potential opt-in plaintiffs under a two-step method.[11] First, they make an "initial determination to send notice to potential opt-in plaintiffs who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010). They must demonstrate that they were "victims of a common policy or plan that violated the law." *Kassman v. KPMG LLP*, No. 11 Civ. 3743(LSG), 2018 WL 6264835, at *25 (S.D.N.Y. November 30, 2018). "While plaintiff's burden at this [initial] stage is modest, it is not non-existent," and it "cannot be satisfied simply by 'unsupported assertions.'" *Khan v. Airport Mgmt. Servs., LLC*, No. 10 Civ. 7734(NRB), 2011 WL 5597371, at *3, *5 (S.D.N.Y. Nov. 16, 2011); *see also Fu v. Mee May Corp.*, No 15. Civ. 4549(KPF), 2016 WL 1588132, at *5 (S.D.N.Y. Apr. 20, 2016) ("'[C]ertification is not automatic.' This modest showing 'must still be based on some substance,'" and "[a] plaintiff must provide some actual evidence of a factual nexus between him and the rest of the class he seeks to represent; conclusory allegations will not suffice.").

At the second certification stage, or "final certification," courts "determine whether a so-called 'collective action' may go forward by determining whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Myers*, 624 F.3d at 555. "The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Id.*

Where, as here, a conditional certification motion is made after significant discovery has occurred, courts focus more closely on the second-step: whether the potential plaintiffs are in fact similarly situated to the named plaintiffs. *Korenblum v. Citigroup, Inc.*, 195 F. Supp. 3d 475, 480–81 (S.D.N.Y. 2016). In applying this "modest-plus" standard, a court will "look beyond the

---

[11] Plaintiffs do not suggest any proposed notice or protocol, but instead only indicate that the parties should meet and confer on a protocol. (Pl.'s Mem. 25 n.7.) No notices should issue.

pleadings and affidavits submitted by Plaintiffs and will consider the evidence submitted by both parties, albeit with an understanding 'that the body of evidence is necessarily incomplete." *Id*. at 482. *See also Jimenez v. Lakeside Pic-N-Pac, L.L.C.*, 2007 WL 4454295, at *2 (W.D. Mich. Dec. 14, 2007) ("where the parties have had an opportunity to conduct pre-certification discovery, courts tend to hold plaintiffs to a higher standard of proof").

## III. MEMBERS OF PLAINTIFFS' PROPOSED EPA COLLECTIVE ARE NOT SIMILARLY SITUATED TO PLAINTIFFS OR EACH OTHER.

The record evidence establishes that there are significant differences among the Plaintiffs and among the EPA Collective members they seek to represent. All of them had unique roles, job titles, responsibilities, and day-to-day duties from others working on the project. And as shown above, none of the 65 individuals identified by Plaintiffs were subject to "a common policy or plan that violated the law." (*Contra* Pl.'s Mem. 22 (citing *Kassman v. KPMG LLP*, No. 11 Civ. 03743(LGS), 2014 WL 3298884, at *5 (S.D.N.Y. July 8, 2014)).)

### A. Plaintiffs Fail to Allege that They Are Similarly Situated With Respect to Their Allegations That the Law Has Been Violated

"The focus of [the] inquiry [during a motion for conditional certification] ... is not on whether there has been an actual violation of law but rather on whether the proposed plaintiffs are 'similarly situated' . . . with respect to their allegations that the law has been violated." *Kassman*, 2014 WL 3298884, at *6. To meet this standard, Plaintiffs must "demonstrate a 'factual nexus' between his or her situation and the situation of other current and former employees." *Young v. Cooper Cameron Corp*., 229 F.R.D. 50, 54 (S.D.N.Y. 2005).

Despite full and extensive discovery, *Plaintiffs cannot produce any objective, specific evidence regarding the other purported class members and their salaries, job functions, and assignments on the LGA project*. This is the fatal blow to their conditional certification Motion. Navar lacks knowledge regarding what any other potential collective member in her group were

paid by Walsh or any other Defendant. (Navar Dep. at 222:3-9.) She did not speak to a single woman on the LGA project, other than Robertson, regarding salaries, and she has no knowledge of salaries of other women working on the LGA project or women who had issues or complaints regarding their salaries. (*Id.* at 295:20-296:7.) It was "just her belief" that women on the LGA project would be appropriate members of the EPA collective action. (*Id.* at 327:8-22; 299:1-22.) Likewise, Robertson failed to identify the salaries or qualifications of women who were allegedly paid less than their male peers. (Robertson Dep. at 94:10-16; 95:3-4; 95:14-15; 96:12-16; 103:7-15.) Her discrimination claims are based solely on her "rumors," "secondhand information" and people "complain[ing] in passing." *(Id.* at 108:7-15.)

This lack of concrete evidence that the purported collective is "similarly situated" with respect to salaries, qualifications, and job duties defeats conditional certification because there is no nexus between Plaintiffs allegations and the purported collective members. Plaintiffs rely on pure speculation regarding the "situations" of other purported collective members, which fails to meet even the low standard for certification in this jurisdiction. *Barfield v. New York City Health & Hosps. Corp.*, No. 05 Civ. 6319(JSR), 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005) (denying conditional certification where the plaintiff presented nothing but "anecdotal hearsay" to suggest that the nurses were engaged in a widespread practice of working in excess of 40 hours per week for multiple agencies and that this was pursuant to an unlawful policy of defendants); *see also Eng-Hatcher v. Sprint-Nextel Corp.*, No. 07 Civ. 7350(BSJ), 2009 WL 7311383, at *3 (S.D.N.Y. Nov. 13, 2009) (determining that plaintiff's general statements in her deposition were insufficient to show that there were illegal practices that applied to others).

**B.      Navar, Robertson, and the Members of the Proposed EPA Collective Had Dramatically Different Job Titles, Duties, and Responsibilities, and Thus They Are Not "Similarly Situated."**

When job duties differ across a proposed collective, courts decline to certify the

collective. *See Romero v. H.B. Auto. Grp., Inc.*, No. 11 Civ. 386(CM), 2012 WL 1514810, at *14 (S.D.N.Y. May 1, 2012) (denying motion for conditional certification and noting that "[p]laintiff has made no showing that the work performed by *all* potential opt-ins is similar to her own"); *Mata v. Foodbridge LLC*, No. 14 Civ. 8754(ER), 2015 WL 3457293, at *3 (S.D.N.Y. June 1, 2015) (denying motion for conditional certification when the plaintiff "includes no concrete facts evidencing a common scheme or plan of wage and hour violations for employees engaged in different job functions" even though his declaration listed "the names and titles of seventeen coworkers-including food preparers, pizza men, counter persons, a cook, a grill man, a juice preparer, a porter, a delivery person, a dishwasher, and a panini preparer"); *Garcia v. Spectrum of Creations Inc.*, 102 F. Supp. 3d 541, 549–50, (S.D.N.Y. May 4, 2015) (limiting certification to only those individuals who performed plaintiffs' specific job positions, because plaintiffs' affirmations "provide[d] no information . . . about individuals who performed other job functions at defendants' business").

Here, Plaintiffs seek to certify a collective of roughly sixty-five women in five different "coordination" groups in at least *fifty* different positions. In spite of (or perhaps because of) the robust record on the varying duties of potential class members, Plaintiffs have not identified any evidence tending to show that employees in the "coordination" groups had any significant similarities during the same relevant time frame. In short, Plaintiffs did not identify a single potential plaintiff who had similar job duties to either of them—likely because none exist. They have not shown that employees' day-to-day tasks are similar. They have not identified any evidence that their job duties or responsibilities are the same. In fact, Plaintiffs concede that "the duties performed by members of the EPA Collective may differ in some respects from those held by the Named Plaintiffs . . . ." (Pl.'s Mem. 23.)

Because there are no actual similarities in the work performed by employees in Plaintiffs'

proposed collective, Plaintiffs instead rely on JV-assigned job titles. Based only on job titles, Plaintiffs argue that jobs in coordination groups must have similar content. Even Plaintiffs, however, recognize that their emphasis is misplaced, as an EPA collective inquiry focuses on "job content and not job title or description." (Pl.'s Mem. 14 (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir. 2005)). And as shown above, JV job titles are a very poor index of similarity between any two particular roles (*see supra* pp. 5-7.)

Plaintiffs' reliance on *Kassman* (Pl.'s Mem. 23) does not help them. In sharp contrast to the record here, *Kassman* involved approximately 7,000 women who each held one of only six job titles. 2014 WL 3298884, at *2. In that case, the evidence purported to show that "employees with the same job title have substantially similar responsibilities and qualifications." *Id.* Expert statistical analysis—unlike Plaintiffs' back-of-the-envelope "averaging" here (*see supra* pp. 15-16.) showed that "nationwide pay disparities . . . attributable to gender are statistically significant at more than eleven standard deviations, meaning that the probability that [the defendant's] compensation could be gender neutral is less than one in one hundred million." *Id.* at *3. All of that evidence, coupled with seemingly centralized compensation policies, led the Court to conclude that the women were similarly situated as the first step of its EPA collective analysis. *Id.* at *6.

This case is starkly different.[12] Here, the individuals with the same job titles did not have the same job responsibilities and duties. (Navar Dep. at 218:23-219:10; Robertson Dep. at 38:15-43:18; Silverman Dep. at 90:4-15; Ex. D, Twidwell Dep. at 186:6-16.) Further, Plaintiffs readily admitted that they do not have a shred of evidence regarding the salary, qualifications, and working conditions of the 65 women they purport to represent and failed to cite any statistical

---

[12] The Court denied final certification, finding the "job content" varied significantly across the proposed collective and there was no "(non-discretionary) uniform causal mechanism for determining pay and promotion operating across the Proposed Collective." *Kassman*, 2018 WL 6264835 at *26.

analysis that demonstrates pay disparities by gender across the LGA project. *Kassman*, 2014 WL 3298884, at *6-7.

Most importantly, Plaintiffs cannot show that anyone in the purported collective is "similarly situated," to them or anyone else, based on some common policy with respect to compensation or to setting salaries. As shown above, certainly there is no common policy at the LGA project for setting compensation. But even with the individual Defendants, each of whom set salaries independently, salary decisions are made from the "ground up" for their own employees, not pursuant to some "top down" process in the JV or even within the individual Defendants themselves. Walsh's and Skanska's corporate witnesses consistently testified that salary decisions were made on an individual basis, by individual managers. (Ex. D, Twidwell Dep. at 176:11-20; 177:14-22.) One Defendant did not and could not make salary decisions or recommendations for another Defendant. (Ex. D, Twidwell Dep. at 176:21-177:8; Silverman Dep. 201:24-25; 202:1-2; 203:6-8.)

## C.     Defendants Do Not Have a Common Policy or Plan that Violates the Law.

Plaintiffs cannot establish that they are similarly situated to each other for the additional reason that there is no record evidence "sufficient to demonstrate that [they] and potential collective members were victims of a common scheme or plan that violated the law." *Morales v. Plantworks, Inc.*, 2006 WL 278154, at *2 (S.D.N.Y. Feb. 1, 2006); *Barfield v. New York City Health & Hosps. Corp.*, No. 05 CIV. 6319 (JSR), 2005 WL 3098730, at *1 (S.D.N.Y. Nov. 18, 2005) (denying conditional certification where the plaintiff presented nothing but "anecdotal hearsay" to suggest that the defendants had a widespread unlawful practice).

Plaintiffs bear the burden of establishing Defendants' three separate and independently run businesses are engaged in a common policy or plan of equal pay violations, which they failed to satisfy. The closest Plaintiffs came with respect to making this showing is to argue that, based

on rumors, second-hand information, and hearsay, that certain women were complaining *they believed* they were paid less than certain men who *they believed* had similar job duties (but who may have not).

Further, Defendants operate as independent businesses, use hiring and salary criteria (at the discretion of individual managers), employ different personnel, and use different pay practices and policies from one another. Their "approvals" of hires by the other Defendants are simply ways of coordinating hiring on the LGA project and do not relate to determining salaries for individuals on the LGA project.

Nor is there any evidence of a plan by any Defendant, individually, to pay women less than men. There is thus not enough evidence to even conditionally certify Plaintiffs' proposed collective. *See Eng-Hatcher v. Sprint-Nextel Corp.*, 2009 WL 7311383, at *3 (S.D.N.Y. Nov. 13, 2009) (determining that plaintiff's general statements in her deposition were insufficient to show that there were illegal practices that applied to others); *Brickey v. Dolgencorp., Inc.*, 272 F.R.D. 344, 348 (W.D.N.Y. 2011) (denying conditional certification where the plaintiffs could not show that violations of a lawful company policy were widespread or common practice).

Because Plaintiffs have failed to meet either the lenient or modest-plus standard necessary to show that workers in the "coordination" groups are similarly situated to the Plaintiffs or to each other, the Court should decline to certify a proposed EPA collective.

## IV.    PLAINTIFFS ARE NOT ENTITLED TO EQUITABLE TOLLING.

The FLSA statute of limitations applicable to EPA claims runs until the date a consent to join is filed. 29 U.S.C. § 256. In certain extraordinary circumstances, which must be established by a plaintiff, equitable tolling "permits courts to extend statutes of limitations on a case-by-case basis in order to prevent inequity," and then, only sparingly. *Johnson v. Academy Mortg. Co.*, No. 2:12-cv-276-TS, 2012 WL 3886098, *3 (D. Utah Sept. 6, 2012) (internal citations omitted);

*Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 90 (1990).

Plaintiffs' request for equitable tolling for the putative "opt-in" plaintiffs should be denied. Plaintiffs' have not demonstrated any "circumstances are so extraordinary that the doctrine should apply," nor have they shown that they "acted with reasonable diligence during the time period [they] seek[] to have tolled." *Kassman v. KPMG LLP*, No. 11 Civ. 03743(LGS), 2015 WL 5178400, at \*4 (S.D.N.Y. Sept. 4, 2015). Plaintiffs also have not demonstrated extraordinary circumstances beyond a party's control and do not even argue (let alone show) any conduct by Defendants has "lulled the plaintiff into inaction." *See Baldwin Cty. Welcome Ctr. v. Brown*, 466 U.S. 147, 151 (1984).  Here, Plaintiffs only contend that the time it took to address joint employer issues is an "extraordinary circumstance" justifying equitable tolling. (Pl.'s Mem. 25 n.6.) The time needed for the Court to address Defendants' motion to sever, however, is quite normal, and not an extraordinary circumstance. *Kassman*, 2015 WL 5178400, at \*8 (citing *Arena v. Plandome Taxi Inc.*, No. 12-1078(DRH)(ETB), 2013 WL 1748451 (E.D.N.Y. Apr. 23, 2013) (finding a twelve month delay "between plaintiffs' request for leave to file conditional certification motion and adjudication of equitable tolling motion was not an extraordinary circumstance to justify equitable tolling"). Hence, equitable tolling is unwarranted.

## CONCLUSION

Plaintiffs, who admit to lacking knowledge regarding the salaries or working conditions of other women in the proposed collective, seek to certify a collective group of employees where the unrefuted evidence clearly shows have widely varying jobs, and who were not subject to any common policies or plans that violated the law. Plaintiffs waived class certification issues and the employees in their proposed collective are not "similarly situated" to one another. The Court should dismiss Plaintiffs' class action claims, deny Plaintiffs' motion for an EPA collective, and decline to issue notices to potential opt-in plaintiffs.

Dated: February 25, 2020

KELLEY DRYE & WARREN LLP   LITTLER MENDELSON, P.C.

By: *s/Mark Konkel*
  Mark A. Konkel      By: *s/Amber Spataro*
  Nidhi Srivastava        Amber M. Spataro (admitted *pro hac vice*)
  101 Park Avenue        Jacqueline E. Kalk (admitted *pro hac vice*)
  New York, New York 10178    Benjamin D. Sandahl (admitted *pro hac vice*)
  mkonkel@kelleydrye.com
  nsrivastava@kelleydrye.com    One Newark Center, 8th Floor
  Phone: (212) 808-7800      Newark, New Jersey 07102
  Facsimile: (212) 808-7898     aspataro@littler.com
  *Attorneys for Defendant Walsh*    jkalk@littler.com
  *Construction Company II, LLC*    bsandahl@littler.com
               Phone: (973) 848-4700
               Facsimile: (973) 643-5626
               *Attorneys for Defendants Skanska USA Civil*
               *Northeast Inc. & Skanska USA Building Inc.*